LAKE VIEW SCHOOL DISTRICT NO. 25 of Phillips County, Arkansas, *et al.* *v.* Governor Mike HUCKABEE, *et al.*

01-836                                                              189 S.W.3d 1

Supreme Court of Arkansas
Opinion delivered June 18, 2004

[Supplemental Dissenting Opinion on Denial of Rehearing September 9, 2004.*]

---

* DICKEY, C.J., and GLAZE and CORBIN, JJ., would grant rehearing. IMBER, J., not participating.

*Lewellen & Associates*, by: *Roy C. Lewellen*, for appellant class.

*Wilson Law Firm, P.A.*, by: *E. Dion Wilson*, for appellant school district.

*Mike Beebe*, Att'y Gen., by: *Timothy Gauger*, Ass't Att'y Gen., for appellees.

*Matthews, Campbell, Rhoads, McClure, Thompson & Fryauf, P.A.*, by *David R. Matthews*, for intervenors Rogers and Bentonville Public School Districts.

*Friday, Eldredge & Clark,* LLP, by: *Christopher Heller,* for intervenor Little Rock School District.

*Mitchell, Blackstock, Barnes, Wagoner, Ivers & Sneddon,* by: *Clayton R. Blackstock* and *Mark Burnette,* for amicus curiae Arkansas Education Association.

*Kaplan, Brewer, Maxey & Haralson,* P.A., by: *Regina Haralson,* for amicus curiae Arkansas Public Policy Panel.

R OBERT L. BROWN, Justice. On April 2, 2004, the Masters filed their report in this matter as directed by this court's *per curiam* order of February 3, 2004. *See Lake View Sch. Dist. No. 25 v. Huckabee,* 356 Ark. 1, 144 S.W.3d 741 (2004). On that same date, this court asked that any objection to the report by the parties be filed within twenty days. *See Lake View Sch. Dist. No. 25 v. Huckabee,* 356 Ark. 587, 157 S.W.3d 192 (2004) *(per curiam).* Several objections and comments were filed, and this court issued a *per curiam* directing an expedited briefing schedule and oral arguments set for May 20, 2004. *See Lake View Sch. Dist. No. 25 v. Huckabee,* 357 Ark. 274, 161 S.W.3d 787 (2004). Briefs were submitted, and oral arguments have been made. We now issue a supplemental opinion in this matter.

Our charge to the Masters in our February 3, 2004 *per curiam* was to examine and evaluate action by the General Assembly to aid this court in determining whether there has been compliance with our opinion in *Lake View Sch. Dist. No. 25 v. Huckabee,* 351 Ark. 31, 91 S.W.3d 472 (2002) *(Lake View III).*[1] We asked that this be done both with respect to legislative action taken by the General Assembly before January 1, 2004, and action taken after that date. We listed ten items for review. Those ten items represented a synopsis of our holdings in the *Lake View III* opinion. The Masters conducted hearings and received testimony from expert and lay witnesses. They also asked for legal briefs from the parties before issuing their report.

We first express our sincere appreciation to the Masters, Bradley D. Jesson and David Newbern, as well as to their staff, for the yeoman service they performed for this court. The Masters'

---

[1] There were two previous *Lake View* decisions handed down by this court. *See Lake View Sch. Dist. No. 25 v. Huckabee,* 340 Ark. 481, 10 S.W.3d. 892 (2000); *Tucker v. Lake View Sch. Dist. No. 25,* 323 Ark. 693, 917 S.W.2d 530 (1996).

Report totals 128 pages and is comprehensive and thorough. It has made the task of this court vastly easier. We accept the factual findings of the Masters pertaining to what legislative action has been taken by the General Assembly and pertaining to what administrative action has been taken by the Department of Education to comply with *Lake View III.*

## I. Adequacy

What comprises an adequate education is apparently subject to considerable debate. The Arkansas Constitution requires the State to "ever maintain a general, suitable, and efficient system of free public schools[.]" Ark. Const. art 14, § 1. In *Lake View III*, we referenced the *Rose* factors for educational goals set out by the Kentucky Supreme Court in *Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186 (Ky. 1989). The Masters opt more for a dictionary definition of "efficiency," which is the "capacity to produce desired results with a minimum expenditure of energy, time, money or materials[.]" *Webster's Third New International Dictionary, Unabridged* 725 (1993). The Masters also deem Dr. James Guthrie's definition of adequacy as coming "as close to being useful as any[.]" That definition is: "an amount of revenue per pupil enabling a student to acquire knowledge and skills specified by public officials as necessary to participate productively in society and to have an opportunity to lead a fulfilling life."

All of these assessments are helpful. We offer no conclusion on the precise definition of an adequate education as we deem that to be a matter better left to the General Assembly and to the State Department of Education.

## II. Adequacy Study

We begin our analysis of the Masters' Report with the Adequacy Study that was the centerpiece of the report filed by the Joint Committee on Educational Adequacy with the General Assembly on September 1, 2003.[2] We do so because it is this study

---

[2] The Adequacy Study was commissioned by the General Assembly, and is composed of three parts: (1) a school-finance adequacy report by Lawrence O. Picus and Associates; (2) a report on developing differential compensation for teachers by Marc J. Wallace, Jr., Ltd.; and (3) an accountability report by State Senator David Bisbee and State Representative Jodie Mahony.

that has formed the benchmark for legislative action and is the model against which the Masters gauged legislative and executive performance since our *Lake View III* decision. We quote the Masters' executive summary of recommendations made in the Adequacy Study:

**a. "The Evidence-Based Matrix" ($224.6 million).** The matrix is described as "the resources needed to provide an adequate education." Among the most important changes recommended to school organization are:

Pupil-teacher ratio of 1 to 15 for grades K-3; 1 to 25 for all other grades;

Additional teachers equal to 20 per cent of the number generated above to provide for enrichment programs for students and planning time for teachers;

Instructional facilitators at each school to help teachers improve instruction;

Additional staff members for schools with high concentrations of poverty, to include tutors and "pupil support personnel" added to school faculty for each 100 students qualifying for federal free and reduced-price lunches, with a minimum of one at each school; in addition, each 100 children identified as "English Language Learners" (ELL) generate an additional 0.40 full-time equivalent (FTE) tutor/teacher;

Adequate staff to meet the needs of children with mild and moderate disabilities;

Catastrophic funding program to provide special education to children with severe disabilities;

Elimination of instructional aide and assistant principal positions; and

Additional funding for professional development, technology, instructional materials, and supervisory aides.

The recommended resource figures contained in the Adequacy Study, unless otherwise specified, are for a prototypic school unit of

500 students at the elementary (K–5), middle (6–8) and high school (9–12) levels. Adequacy Study at 19.

**b. Teacher Compensation ($356 million)**, the components of which are:

Ten per cent (10%) salary increases ($183 million) to "bring teacher salary levels up to market levels for teacher pay in the surrounding southern states. In exchange for this dramatic increase, a performance based system that rewards teachers for what they know and can do will be put in play. Once implemented, future large increases in salary will only be available to teachers who demonstrate growth in knowledge and skills [which] research shows leads to improved student performance." Adequacy Study at v.

Salary formula "adders" ($94 million) used to provide additional salary funds: to attract teachers to less desirable geographic areas of the state; to provide additional salary for teachers in subject areas where there are currently shortages; and to provide additional salary for teachers with advanced graduate degrees.

Extending teacher contracts for five (5) days ($45 million) to provide additional time for professional development;

Performance bonus system ($30 million) to enable all teachers in a school to earn annual bonuses as a faculty in the event that student achievement is "boosted" from the previous year; and

Establishment of an appraisal system ($4 million) to implement these recommendations.

**c. Early Childhood Education ($100 million).**

*Total Cost.* Thus, the total cost of the "matrix" or "adequacy model," as itemized in "a," "b," and "c," above, **increases** the state's total spending for pre-kindergarten through 12 education by $680.6 million over "current" (2001–2002) expenditures from state and local sources for operation and maintenance. Adequacy Study at 65.

**d. Funding Formula ($166.7 million property tax transfer).**

[Footnotes omitted.]

The Masters concluded that the Adequacy Study was "thorough in its approach."

### III. Legislation

We turn then to the legislation enacted to implement and fund the recommendations made in the Adequacy Study. According to the Masters, the funding reforms enacted by the General Assembly were "laudable." What follows is a summary of the Masters' findings relating to the ten issues listed in our February 3, 2004 *per curiam*. Not all of the legislation passed by the General Assembly in response to *Lake View III* and discussed in the Masters' Report is referenced in this opinion. We discuss only the significant legislation that appears integral to the Masters' findings and conclusions.

### 1. The Adequacy Study prepared for the General Assembly and the steps taken by that body to implement the study.

In the Masters' general observations, they noted first the herculean task of defining what is an "adequate" education. The Masters then went on to make the following findings and conclusions regarding legislative steps to implement the Adequacy Study.

The Masters noted that the General Assembly had created the Joint Committee on Educational Adequacy to oversee compliance with the *Lake View III* decision in the Regular Session in 2003 by Act 94 and that on September 1, 2003, the Joint Committee filed its report with the General Assembly.[3] Also during the Regular Session, the General Assembly passed Act 603, which requires school districts to establish plans for more parental involvement in the public schools

In the Second Extraordinary Session, multiple legislation was passed, including a masters program for school principals (Act 44), goals for family resource centers to improve performance of

---

[3] This court's February 3, 2004 *per curiam* asked the Masters to separate legislation enacted pre-January 1, 2004, and legislation enacted thereafter. Because virtually all of the significant legislation enacted post-January 1, 2004, was enacted in the Second Extraordinary Session, we separate the significant legislation by reference to the Regular Session and the Second Extraordinary Session.

economically-disadvantaged students (Act 68), special-education catastrophic funding (Act 77), and mandatory professional-development planning for teachers, administrators, and staff (Act 83). In addition, Act 59, the Public School Funding Act, provides per-pupil funding of $5,400 as the base-level foundation amount.

*Masters' Conclusions*

The Adequacy Study recommended student-teacher ratios of 15 to 1 for kindergarten through third grade and 25 to 1 for other grades. The General Assembly assumed ratios of 20 to 1 for kindergarten, 23 to 1 for grades 1 through 3, and 25 to 1 for grades 4 through 12. The ten percent across-the-board general salary increase for teachers recommended by the Adequacy Study and a knowledge-and-skills-based pay were not enacted. Only $40 million of the $100 million recommended in Adequacy Study for early-childhood education was appropriated.

**2. The steps taken by the State to put in place a system to assess, evaluate, and monitor public school curricula offered in all primary and secondary schools in the state.**

In the Regular Session the General Assembly passed nine acts that related to this subject, including Act 1467, the Omnibus Quality Education Act, which requires all schools and school districts to meet Standards of Accreditation and creates a procedure to enforce those standards for probationary schools including, but not limited to, closure, annexation, and consolidation. The Act further mandates academic-content standards and increased testing of students and requires review and revision of the content standards. Act 1761 requires the State Board of Education to develop a plan for reviewing and revising the curriculum frame-work in core-academic areas, including reading, writing, math-ematics, science, history, geography, and civics. Act 1116 requires the elimination of low-level, general-education tracks.

The Department of Education adopted rules to implement the Act 1467 standards, including a core curriculum for gradua-tion, testing of students at each grade level, gifted-and-talented programs, and the ability for students to transfer from an academically-distressed school.

In the Second Extraordinary Session, the Masters identified sixteen acts of the General Assembly that touch and concern this subject. These enactments included programs to assist with the

academic performance of the students in the Arkansas Delta region. Act 35 requires assessments in compliance with the requirements of the No Child Left Behind Act of 2001 (a federal act), additional testing programs, remediation programs for reading, writing, and mathematics, and reports to high schools of the academic readiness of college freshman. Act 52 requires accounting for the expenditure of state funds on athletic programs, and Act 60 provides for administrative consolidation of districts with fewer than 350 students.

### Masters' Conclusions

The Masters fault the Department of Education for not adopting rules and guidelines to implement procedures for review and revision of the standards of accreditation. They note, however, the provisions for early remediation in elementary grades for students who do not demonstrate proficiency in reading, writing, and mathematics. They conclude that the General Assembly and Board of Education have made "a good beginning" toward monitoring, assessing, and evaluating school curricula, with dramatic improvement to be evident in five to ten years.

**3. The steps implemented by the State to assure that a substantially equal curriculum is made available to all school children in this state.**

The Masters identify nine Regular Session acts and fifteen acts from the Second Extraordinary Session that relate to this item, many of which have already been discussed. In addition, Act 1192 of the Regular Session establishes the Arkansas Distance Learning Development Project, which affords students a more enriched curriculum when qualified teachers and courses are not available in the particular school district, and Act 35 of the Second Extraordinary Session allows student transfers from failing schools. The Masters placed the steps taken by the legislative and executive branches to achieve a substantially equal curriculum into four categories: early-childhood education, technology, school choice, and administrative consolidation.

In their introductory comments, the Masters endorsed early-childhood education as essential for an adequate education and as a means of providing substantial equality in the curricula offered. They note that the Adequacy Study recommended $100 million be spent to provide preschool education for every three- and

four-year old from a family with income at or below 200 percent of the poverty level. The General Assembly only appropriated an additional $40 million, but it created a five-year plan for implementation.

The Masters further endorse the principle of economies of scale and suggest that savings could be realized from additional consolidation of schools as well as movement toward substantially equal curricula by means of larger school districts.

**4 & 5. The steps taken by the State to assess and evaluate public school buildings and educational equipment across the state. The steps taken by the State to implement measures to assure that substantially equal school buildings and school equipment are available to all school children in the state.**

In the Regular Session, the General Assembly created the Joint Committee on Educational Facilities by Act 1181 to recommend what constitutes an adequate school facility and to establish a method for providing substantially equal facilities and equipment for all schools. The Joint Committee in turn appointed a Task Force consisting of experts in the fields of construction and engineering to assist in the project. The General Assembly also appropriated $10 million for the facilities assessment (Act 84 of Second Extraordinary Session) and prohibited the closing of any school facility until the assessment was completed (Act 60 of Second Extraordinary Session). The report on the assessment of school facilities is due December 1, 2004, and will be presented to the General Assembly for action in 2005.

*Masters' Conclusions*

The Masters concluded that the $10 million assessment "should prevent redundancy of effort, duplication of facilities, and waste of financial resources in the future." The Masters also referred to one State expert, Dr. James Smith, who concluded it would take at least five years to achieve adequacy for the state's school facilities.

The Masters questioned, however, the State's delay in addressing this need for substantially equal facilities until 2005 and called it "shortsighted," since inferior existing facilities will continue to deteriorate, and it is unclear whether current appropriations are available to meet "critical needs" in school facilities.

The Masters specifically took the General Assembly to task for not including "unattached equipment," such as media, labo-

ratory, fine arts, and computer equipment in the facilities assessment. It is also unclear, the Masters say, whether current appropriations cover the purchase of capital equipment. Apparently some funding for "technology" and "instructional materials" was included in the $5,400 extrapolated for per-pupil funding.

The Masters conclude that the schools' need for unattached equipment must be addressed in the assessment of the State's school facilities and by future appropriations.

**6. The measures in place to assure that teacher salaries are sufficient to prevent the migration of teachers from poorer school districts to wealthier school districts or to neighboring states.**

By Act 1745 of the Regular Session, the General Assembly established the Office of Teacher Recruitment within the Department of Education. Act 1746 of the Regular Session also established a program to recruit minority teachers to the Delta region and other areas where teacher shortages exist. Other legislation provided incentives for teachers in the form of scholarships, loans, and bonuses to locate in priority districts, as well as the establishment of a masters degree program. Under Act 1803 of the Regular Session, teachers who receive national board certification will receive increased incentive bonuses from $3,000 to $4,000 in 2004 and from $4,000 to $5,000 in 2005.

Act 74 of the Second Extraordinary Session sets out minimum teacher salaries for the 2004–05 school year:

- Starting salary for a bachelor's degree and no experience is $27,500 (up from $21,860);

- For a Master's degree and zero years experience, $31,625 (up from $25,139); and

- Annual increments of $450 for a bachelor's degree and $500 for a master's degree.

Act 39 of the Second Extraordinary Session provides additional incentives to teachers teaching in high-priority areas such as low-interest loans and second mortgages and rental-housing programs. There was also legislation passed to monitor teacher salaries and compare those salaries in-state and out-of-state (Act 57 of the

Second Extraordinary Session) and legislation requiring each district to prepare a professional development plan (Act 83 of the Second Extraordinary Session).

Under Act 101 of the Second Extraordinary Session, teachers who teach in high-priority districts will receive a one-time signing bonus of $4,000 and $3,000 for each of the next two years. There will be a $2,000 retention bonus for those already teaching in these districts.

*Masters' Conclusions*

The General Assembly addressed this issue of migrating teachers with salary increases and incentives. As already related, it did not enact a general pay increase for teachers of ten percent. The State Defendants could never provide an "average" teacher salary figure for the 2002-03 or 2003-04 school year, and the Masters described this failure as "disconcerting."

The Masters questioned whether the measures in place assure poorer school districts that they can be more competitive with neighboring states with respect to their teachers. State Senator David Bisbee testified that the $5,400 per-pupil expenditure contemplated projected average teacher pay of $39,000 for the school year 2004-05, which is less than what three contiguous states were paying in 2002-03.

The Masters said they "cannot ignore" the many laws passed by the General Assembly in addition to salary measures to influence teachers to remain in or migrate to poorer districts as well as administrative consolidation. Because of these measures, more money may go toward increasing teacher salaries. This "will not be known for at least another year[,]" they concluded.

**7. The accountability and accounting measures in place for the State to determine per-pupil expenditures and how money is actually being spent in local school districts.**

The Masters were very positive about the numerous steps the General Assembly took regarding information provided to the public about school expenditures. They describe these accountability and accounting steps as "laudable" in determining per-pupil expenditures and where the money is going.

Among those measures receiving special comment by the Masters are the following:

- Act 1467 of the Regular Session to identify, assess, and address the fiscal-distress status of school districts which may lead to closure, annexation, or consolidation.

- Act 35 of the Second Extraordinary Session to develop a system for determining if districts meet "best financial management code" practices. School districts must be reviewed on site, graded, and be publicly reported.

- Act 52 of the Second Extraordinary Session requiring districts to account for state funds used in athletic programs.

- Act 61 of the Second Extraordinary Session requiring annual budget and expenditure reports from the districts, a uniform budget and accounting system, and accounting training. Reports will go to the Governor, Education Board, and General Assembly.

- Act 90 of the Second Extraordinary Session creating the Division of Public School Accountability to report public-school compliance with fiscal accountability to the General Assembly.

## 8. The accountability and testing measures in place to evaluate the performance and rankings of Arkansas students by grade, including rankings in-state, regionally, and nationally.

The Omnibus Quality Education Act of 2003 (Act 1467 of the Regular Session) provides for the standards of accreditation for all public schools to meet, as this opinion has already discussed. Failure to meet the standards results in probationary status for a school, or district, or even academic-distress status, and the potential for annexation, closure, or consolidation. The State Board of Education is ordered to develop a single testing, assessment, and accountability program and to classify school services, including the use of technology. Academic-content standards shall be set by the Board for all school districts with schedules for periodic review and revision, trend data for each school shall be maintained, and school-improvement plans shall be developed when necessary.

Regulations were adopted by the Board of Education in 2003 to develop a single, comprehensive testing, assessment, and accountability program for all public schools to ensure that all students have an equal opportunity to demonstrate proficiency in core subjects.

During the Second Extraordinary Session, the General Assembly enacted Act 35, the Arkansas Student Assessment and Educational Accountability Act of 2004, which established, in

part, a testing program. Expected levels of achievement shall be set by the Board of Education and failure of a student or school to achieve those levels shall result in participation in an improvement plan. Longitudinal tracking of a student's progress shall be measured against a national norm. Intense remediation programs will be required for students in kindergarten through twelfth grade who do not demonstrate proficiency in subjects such as reading, writing, and mathematics. Annual reports shall be provided to parents, and school-performance reports shall be published in local newspapers. Schools are to be classified from Level 1 (schools in need of immediate improvement) to level 5 (schools of excellence for improvement). Students in schools at the two lowest levels will be offered a public-school choice option with transportation provided. Schools at the highest levels are eligible for performance-based funding. The high schools of students in college who require remediation shall be reported to the Board of Education and to the General Assembly.

Act 90 of the Second Extraordinary Session enacted the division of Public School Accountability to be placed under the Board of Education to administer all monitoring and compliance activities.

*Masters' Discussion and Conclusions*

According to State expert Dr. James Guthrie, Arkansas now has a state-of-the-art accountability system. As a result of Act 1467, the Masters conclude that "our state now has better tools to correct deficient school and school district performance." Act 35 "mandates a number of new tests" for students kindergarten through twelfth grade, with testing for grades three through eight, linked to a national norm. According also to Dr. Guthrie, Act 35 links performance to funding with gains or losses in performance-based funding depending on how well a school is doing. And Act 57 of the Regular Session requires periodic review of academic standards and student and school performance.

The Masters conclude that the General Assembly undertook an "ambitious slate" of bills and enacted an "impressive number of them." They conclude further that much needs to be done to fully implement the system, such as the adoption of rules, commission appointments, training, and development of assessment instruments. To say that measures are in place for accountability and testing, they believe, is "premature."

**9. The measures taken by the General Assembly to enact a school funding formula and to fund it so that the school children of this state are afforded (a) an adequate education, and (b) a substantially equal educational opportunity so as to close the gap between wealthy school districts and poor school districts.**

We have already alluded to school-choice programs, minority-teacher scholarship programs, teacher bonuses to teach in priority areas, and distance-learning programs passed in the Regular Session of the General Assembly.

In the Second Extraordinary Session, enhanced programs in those same categories were enacted, as well as Act 49, which specified guidelines in early-childhood education to be phased in over five years, Act 99 providing an additional $40 million for that program for a total of $53 million, and Act 52 to track funds spent on interschool athletic programs.

Act 59 of the Second Extraordinary Session is the Public School Funding Act for the 2004-05 school year which set forth a foundation figure of $5,400 times the average daily membership in the district's schools for the previous year, with additional funds to be made available for students in the national school lunch program, for English as a second language, and for alternative learning environments, as well as teacher base salaries. Acts 60 and 80 provided for administrative consolidation of districts with less than 350 students, effective July 1, 2004.

Act 77 of the Second Extraordinary Session appropriates $2.1 billion for foundation aid for the 2004-05 school year:

| | ITEM | FISCAL YEARS 2004-2005 |
|---|---|---|
| (01) | STATE FOUNDATION FUNDING AID | $1,760,751,092 |
| (02) | NATIONAL SCHOOL LUNCH STUDENT FUNDING | 132,146,400 |
| (03) | ALTERNATIVE LEARNING ENVIRONMENT STUDENT FUNDING | 15,914,438 |
| (04) | ENGLISH LANGUAGE LEARNER STUDENT FUNDING | 3,128,210 |

| | | |
|---|---|---|
| (05) | PROFESSIONAL DEVELOPMENT FUNDING | 22,251,515 |
| (06) | GENERAL FACILITIES FUNDING | 8,115,181 |
| (07) | DEBT SERVICE FUNDING SUPPLEMENT | 27,535,288 |
| (08) | STUDENT GROWTH FUNDING | 41,291,748 |
| (09) | ISOLATED FUNDING | 9,076,387 |
| (10) | SPECIAL EDUCATION CATASTROPHIC OCCURRENCES | 8,800,000 |
| (11) | COURT ORDERED DESEGREGATION | 56,800,000 |
| | TOTAL AMOUNT APPROPRIATED | $2,085,810,259 |

Act 89 of the Second Extraordinary Session presents a constitutional amendment to Arkansas voters, to be voted on in November 2004 which would raise ad valorem taxes per school district for maintenance and operation from 25 mills to 28 mills. Act 69 of the same session provides incentive money for those districts raising their millages above the 25-mills level.

Act 107 of the Second Extraordinary Session increases the sales tax by 0.875% beginning March 1, 2004, to fund education, and Act 94 of the Second Extraordinary Session increases the corporate franchise tax for the same purpose. One State expert, Dr. James Guthrie, praised the General Assembly for increasing funding for education by almost eighteen percent.

Act 57 of the Second Extraordinary Session proposes to revisit the funding formula each biennium and provide a continuing evaluation of adequacy.

### Masters' Conclusions

*a. Adequacy*

The Adequacy Study recommended a total state commitment of $2.435 billion with an increase of $680.6 million. Under Act 59 of the Second Extraordinary Session, the increase in spending for the 2004–05 school year is $394,479,900.

The Adequacy Study proposed an average cost per pupil of $6,230. The Department of Education projects an average of

$6,000 per student from Act 59, which includes base-level, per-pupil funding ($5,400) with additional funding for special programs.

Funds were raised by increases in the sales tax, corporate franchise tax, and, potentially, the base millage to 28 mills, if the constitutional amendment passes.

### b. Equalization of Educational Opportunities

Equalization is realized by State supplements to the uniform millage rate of 25 mills. Closing the gap between poor and wealthy school districts is addressed with programs like distance learning, public school choice, pre-kindergarten programs, and programs to recruit and retain teachers in high-priority districts.

Local school districts still have discretion in how school funds are spent. The Masters conclude that the Department of Education's ability to monitor and assess district practices and to take remedial action "will be critical in determining the equality of educational opportunity throughout the State."

### 10. The measures taken by the General Assembly to assure that funding education is the priority matter in the budgetary process.

Act 108 of the Second Extraordinary Session creates the Educational Adequacy Fund and requires that the State's Chief Fiscal Officer make transfers from other funds and accounts to maintain sufficient funding to meet the State's obligation to provide an adequate education.

### Masters' Conclusions

Act 57 of the Second Extraordinary Session recognizes a continuing duty to assess what is an adequate education in Arkansas. Act 59 of that session recognizes the *absolute duty* to provide all public-school children with an adequate education and bases school funding on per-pupil expenditures. Funding education must now take place, even if that requires taking money from other state fund accounts on a *pro rata* basis.

These reforms are "laudable," the Masters conclude. These Acts now "establish the State's intent to assure that funding education is *the* priority in funding for the school year of 2004-2005."

## IV. Issues

### a. Adequacy and Equity

One issue raised in the Masters' Report is whether this court's term "substantial equality" in *Lake View III* means a basic level of adequate education for all or whether it means identical education assets for all.

We said in *Lake View III* that "[i]t is the State's responsibility, first and foremost, to develop forthwith what constitutes an adequate education[.]" *Lake View III*, 351 Ark at 79, 91 S.W.3d at 500. We went on to say that it is the State's responsibility to afford a substantially equal educational opportunity to all school children, based on what comprises an adequate education. *See id.*

An adequate educational opportunity must be afforded on a substantially equal basis to all the school children of this state. This does not mean that if certain school districts provide *more than* an adequate education, all school districts must provide *more than* an adequate education with identical curricula, facilities, and equipment. Amendment 74 to the Arkansas Constitution allows for variances in school district revenues *above* the base millage rate of 25 mills, which may lead to enhanced curricula, facilities, and equipment which are superior to what is deemed to be adequate by the State. Nevertheless, the overarching constitutional principle is that an adequate education must be provided to all school children on a substantially equal basis with regard to curricula, facilities, and equipment. Identical curricula, facilities, and equipment in all school districts across the state is not what is required.

### b. Early-Childhood Education

In their introductory comments, the Masters refer to the deposition testimony of Janie Huddleston, Director of the Child Care and Early Childhood Education Division of the Department of Human Services, to the effect that research shows if a child is not proficient by the fourth grade, money spent on remediation which was not spent on early-childhood education "would have a much lower chance of bringing the child to a proficiency level." The Masters note that the Adequacy Study showed a need of $100 million for early-childhood education, while the General Assembly appropriated only $40 million for the first year. The Masters conclude with this statement:

That evidence means to us that the need to provide substantial equality as a goal for all children, including those at high risk of lacking proficiency in early childhood, is one with which the court should be concerned in assessing the progress toward constitutionality of Arkansas's school system.

In addition, the Little Rock and Pulaski County Special School Districts argued in their response and brief and at oral argument as well that $40 million was not enough and that this court should mandate more in the way of funding, since the General Assembly has now recognized early-childhood education as integral to achieving adequacy.

We disagree that early-childhood education is a program that this court can now mandate to be funded at a certain level. In *Lake View III*, we made it clear that the Arkansas Constitution specifically endows the General Assembly with the authority to authorize and fund early-childhood education. Article 14, § 1, states in pertinent part that the General Assembly and public school districts "may spend public funds for the education of persons over twenty-one (21) years of age and under six (6) years of age, as may be provided by law, and no other interpretation shall be given to it." This language could not be clearer. The General Assembly, and it alone, provides what early-childhood-education programs shall be implemented. The people have spoken on this issue, and this court will not second-guess the people. We conclude, as we did in *Lake View III*, that early-childhood education, apart from legislative enactment, is not mandated by the Arkansas Constitution.

### c. Consolidation

Consolidation of school districts was not expressly referenced in our *Lake View III* opinion. Nevertheless, an efficient education is what Article 14, § 1, of the Arkansas Constitution requires, which begs the question of whether this State can ever offer an adequate and substantially equal education to all its children without effective consolidation. This appears to be the question posed by the Masters, both in connection with better teacher pay and equality of curricula, facilities, and equipment. Governor Mike Huckabee seizes on this same theme and contends that more consolidation is essential in order for an adequate and equal education to be made available, and his counsel at oral argument argued that diseconomies of scale impede the possibility of obtaining a substantially equal educational opportunity.

The Masters appear to obliquely consider consolidation as part and parcel of an efficient education. They allude to Act 60 of the Second Extraordinary Session of 2003, which provides for administrative consolidation of school districts with less than 350 students, with no school to be closed until July 1, 2005. They refer to the variety of course offerings and suggest that a greater variety of curricular offerings to high-school students across the state cannot be accomplished without consolidation, as it will not be economically feasible to do so in small school districts.

■ We will not venture into this debate and mandate a specific consolidation program, as we are firmly convinced that an efficient public education as well as a general and suitable public education must be ordained by the executive and legislative branches of this State. What is radiantly clear, however, is that if an adequate curriculum, adequate facilities, and adequate equipment cannot be afforded to the school children in the smaller school districts of this state due to a lack of sufficient economic resources, more efficient measures to afford that adequacy will be inevitable.

*d. Facilities and Equipment*

■ The statewide facilities and equipment, funded by a $10 million appropriation study, will be completed by December 1, 2004, in order to permit the General Assembly to begin implementing it during the 2005 General Session. No one disputes the fact that this court's mandate for adequate and substantially equal facilities and equipment is only at square one. While, like the Masters, we believe a Facilities Study is necessary to define what needs to be done, the scope of renovation, new construction, and replacement is an unknown at this time, as is the time frame for the ultimate construction and the funding and debt service. Considerable legislation needs to be passed in this area, and that will not begin until 2005. Neither the Masters nor this court can gauge and assess in any respect the significant steps to be undertaken in the future to meet this constitutional challenge.

*e. Teacher Pay*

The Masters observed that the ten percent across-the-board teacher pay increase recommended by the Adequacy Study had not been enacted. Rather, the General Assembly has raised beginning salaries dramatically and provided substantial bonuses and other incentives for performance and work in high-priority areas like the Delta.

The Masters voiced reservations as to whether the gap in teacher pay between poorer and wealthier school districts will ever be completely closed due to Amendment 74.

■ The General Assembly has addressed this issue in a meaningful way. Though counsel for Lake View advocated a uniform salary scale for teachers, while the Adequacy Study advocated an increase, we cannot say that the General Assembly has failed to address this issue.

*f. Other Deficiencies*

Four other deficiencies found by the Masters bear mentioning. Standards of Accreditation, as contemplated by Act 1467, had not been adopted by the Department of Education, at least by the time the Masters' Report was issued. Unattached equipment was not included in the Facilities Study. The Department of Education could not identify Arkansas' average teacher salary. To implement accountability measures fully, rules need to be adopted, commissioners appointed, and training of personnel needs to occur. This has yet to be done.

There were also questions posed to the Senior Assistant Attorney General, Tim Gauger, at oral argument on May 20, 2004, about whether the Department of Education had followed through with directives from the General Assembly regarding the establishment of an Office of Teacher Recruitment and the identification of teacher-shortage issues. He could not answer these questions, which amplify our concern over the additional work that remains to be done.

### V. Conclusion

We join the Masters and the State's experts in their praise for the work done by the General Assembly in the field of education, particularly during the Second Extraordinary Session after January 1, 2004. The Masters use the term "laudable" in connection with much of the legislation passed. The accounting and accountability measures set in place appear to be state-of-the-art. And Act 108, which requires that education be fully funded and directs the chief fiscal officer to tap into other funds on a pro-rata basis to pay for the educational programs appears to be unprecedented in any other state in this nation. The legislative accomplishments have been truly impressive.

What follows are samples of the praise from the State's experts drawn from the Masters' Report:

- Dr. James Smith testified that the General Assembly's move to consolidate some 19% of our 308 school districts was "dramatic."

- Dr. James Guthrie said: "I believe that in my 40 years of professional experience in this kind of endeavor, I have never before seen a state which leapfrogged an entire century and went from the 19th century into the 21st century. The enactments are dramatic, comprehensive, and the amount of money that will be distributed as a consequence of them is about the largest I've ever seen proportionally."

- Dr. James Guthrie also said: "So in their [economists Evans, Murry, and Schwab, who study states under court order to achieve adequacy and equity] analysis no state at that time had achieved an 18 percent increase. I have never seen a state commit to fund education ahead of all other government functions as is found in Act 108."

At oral argument, this court was urged by counsel for Lake View, counsel for Governor Mike Huckabee, counsel for the Little Rock and Pulaski County Special School Districts, and counsel for the Bentonville and Rogers School Districts to retain jurisdiction. Each party had a separate reason: Lake View wanted this court to declare Act 60, the consolidation act, unconstitutional; Governor Mike Huckabee wanted more consolidation; the Little Rock and Pulaski County Special School Districts wanted more early-childhood education funding; and the Bentonville and Rogers School Districts wanted this court to "stay the course" and assure that facilities and equipment were equalized. A common theme throughout much of the oral arguments was that if this court does not serve as a "watchdog" agency to assure full compliance with *Lake View III*, the General Assembly will not complete or fully implement what it has already begun. Indeed, the unspoken threat is that the General Assembly might renege or backtrack on school measures already passed.

█ There are two things that bother us about these arguments. First, it is not this court's role under our system of government, as created by the Arkansas Constitution, and under the fundamental principle of separation of powers, as set out in Article 4, § 2, of that document, to legislate, to implement legislation, or to serve as a watchdog agency, when there is no matter to be presently decided. This court made it perfectly clear in *Wells v. Purcell*, 267 Ark. 456, 592 S.W.2d 100 (1979), that the

judicial branch cannot arrogate to itself control of the legislative branch. Our role is to hear appeals and decide. cases where we have original jurisdiction.

We know of no other case in Arkansas, or any other jurisdiction for that matter, where an appellate court has recalled its mandate and appointed masters to assure that its decision is carried out, other than what this court has already done to assure compliance with *Lake View III*. Indeed, this court's actions in recalling the mandate and appointing masters to assure compliance were "extraordinary" to use the words of counsel for Governor Huckabee. Yet, we deemed those actions to be necessary because of the circumstances that existed in January of this year when we recalled our mandate. At that time, the General Assembly had not enacted the Public School Funding Act (Act 59) to implement the Adequacy Study, the $2.1 billion appropriation to fund education (Act 77), and the sales tax measure to fund new and existing programs (Act 107). Moreover, major legislative programs to equalize educational opportunity, to improve teacher pay, to assess facilities and equipment, to require uniform budgets and account- ing, to test and track student progress, and to make education the number one priority had not been passed, as has already been thoroughly detailed in this opinion.

■ Our second point is aligned with the first. While the General Assembly began slowly in enacting compliance legislation, after this court recalled its mandate and appointed masters, a barrage of legislation was passed. Each of the ten points in *Lake View III* was addressed. We cannot say that we would have recalled our mandate had the legislation described in this opinion been passed prior to January 1, 2004. Admittedly, some measures, and specifically funding measures and those relating to facilities and equipment, have not been brought to fruition. But we presume they will be, as we presume government officials will do what they say they will do. *See Dilday v. State*, 300 Ark. 249, 778 S.W.2d 618 (1989); *Arkansas Pollution Control Comm'n v. Coyne*, 252 Ark. 792, 481 S.W.2d 322 (1972). To assume otherwise runs counter to our case law. Furthermore, to retain jurisdiction under these circum- stances will disparage the work of the General Assembly and cast the role of this court into that of a brooding superlegislature, when compliance with *Lake View III* is already well underway on all fronts.

■ Various parties and the dissent call upon this court to continue to monitor the General Assembly. But for how long? Until the adjournment *sine die* of the 2005 General Session? Until all legislative programs discussed in this opinion have been fully funded? Until all facilities and equipment and curricula deemed essential for an adequate education have been made substantially equal? What has been set in motion by the General Assembly and Executive Department will take years and perhaps even a decade to implement fully. Again, it is not this court's constitutional role to monitor the General Assembly on an ongoing basis over an extended period of time until the educational programs have all been completely implemented or until the dictates of *Lake View III* have been totally realized.

■ Accordingly, we release jurisdiction of this case and the mandate will issue. The resolve of this court is clear. We will not waver in our commitment to the goal of an adequate and substantially equal education for all Arkansas students; nor will we waver from the constitutional requirement that our State is to "ever maintain a general, suitable, and efficient system of free public schools[.]" Make no mistake, this court will exercise the power and authority of the judiciary at any time to assure that the students of our State will not fall short of the goal set forth by this court. We will assure its attainment.

HANNAH, J., concurs.

DICKEY, C.J., GLAZE and CORBIN, JJ., dissent.

IMBER, J., not participating.

Special Justice CAROL DALBY joins.

JIM HANNAH, Justice, concurring. I concur because I believe that this case must finally be brought to a close. However, I take this opportunity to again express my deeply held concerns about the precedent that we are setting. It is not within our authority to dictate what sort of educational system the legislature must provide. Rather, our duty is to declare whether a system implemented by the legislature is constitutional once a proper appeal from a circuit court decision on the issue is presented to us. Our jurisdiction on this issue is appellate, rather than original, and our authority does not extend beyond interpretation we have stated:

> Ever since *Marbury v. Madison*, 1 Cranch 137, was decided in 1803, the Supreme Court has had the responsibility of interpreting the

United States Constitution and the State courts that of interpreting the State Constitutions. But the judicial authority does not extend beyond interpretation. The courts do not have the power to hold a constitutional mandate in abeyance; they should not have that power. The constitutional way of doing things may be slow at times, but it is the right way.

*City of Hot Springs v. Creviston*, 288 Ark. 286, 293C-D, 713 S.W.2d 230, 231 (1986). This court has made it clear over the years that its authority does not reach to supervising or overseeing the actions of the other branches of government. In *Wells v. Riviere*, 269 Ark. 156, S.W.2d 375 (1980), we clearly stated:

> We do not even imply that we have the authority to dictate to the General Assembly, the legislative branch of this state government, how it proceeds about its business. It can convene as it pleases. *Wells v. Purcell*, 267 Ark. 456, 592 S.W.2d 100 (1979). However, whether its acts are lawful is a matter for this court. That was decided by the United States Supreme Court in an opinion written by Chief Justice John Marshall in *Marbury v. Madison*, 1 Cranch 137 (1803).

*Wells*, 269 Ark. at 169.

I wrote separately in *Lakeview III* because of language in the majority opinion that I feared would create confusion about the role of the separate branches of government in providing a "general, suitable, and efficient system of free public schools," as required by art. 14, § 1 of our constitution. I am even more convinced that the path this court must take was succinctly and plainly set out in my concurrence to *Lakeview III*.

I wrote a concurrence to the January 22, 2004, *per curiam* recalling our mandate in *Lakeview III* because of my concern that we were stepping on to a very slippery slope leading directly to a violation of the separation-of-powers doctrine. I agreed to the recall of the mandate because of an assertion that the decision of this court in *Lakeview III* was being ignored and violated. That is an issue wholly separate from the issue of whether the General Assembly passed acts in the last legislative session which when implemented would provide a constitutional system of free public schools in the future. Upon the recall of the mandate, we lacked jurisdiction to determine whether the acts passed by the General Assembly in the last legislative session passed constitutional muster.

My greatest fear has been realized. After we took the unprecedented step of recalling the mandate in this case, we were

asked at the very first opportunity to retain jurisdiction and oversee the work of the General Assembly. There is no precedent for overseeing the work of the General Assembly, and we have no authority to do so. There are sound reasons behind the decision of our forefathers to set up three co-equal branches of government, and the resulting system of checks and balances has served us well. We should be highly reluctant to injure the venerable doctrine that has served us so well.

I share the majority's concern regarding the state of the public schools, but in our zeal to see the wrong righted, we may not allow ourselves to fall to the temptation of attempting to do by judicial fiat what we believe the General Assembly has been unable to do on its own. The constitutional way is the slower way, but the better way. *Creviston, supra.* If we succumb to the temptation to oversee the work of the General Assembly, we will be deluged with request after request to retain jurisdiction, not only in this case, but in case after case in the future.

TOM GLAZE, Justice, dissenting. When considering earlier opinions in this case, the reader of the majority opinion may find it extremely confounding. One must keep in mind that, even as of today's decision, *no* court, including this court, has held the State's public school funding system constitutional. In fact, as early as 1983 — twenty-one years ago — our court held the State's educational system unconstitutional. *See Dupree v. Alma School District No. 30,* 279 Ark. 340, 651 S.W.2d 90 (1983). After *Dupree,* the General Assembly subsequently passed legislation in an attempt to bring Arkansas' educational system up to constitutional muster, but, as we now know from this Lake View litigation, the General Assembly's efforts fell far short of the mark.

There are at least two reasons why the people of Arkansas are so late in learning that the State's public educational system remains unconstitutional after the *Dupree* decision. First, the *Dupree* court held the public educational system unconstitutional, but in doing so, the court limited its jurisdiction by deferring all remedial matters of achieving a constitutional system to the General Assembly. *See Lake View Sch. Dist. No. 25 v. Huckabee,* 340 Ark. 481, 10 S.W.3d 892 (2000) (Glaze, J., dissenting). In adopting this limited or restrictive stance, the *Dupree* court stated the following:

> The dispositive answer to the above arguments is simply that *this court is not now engaged in — nor is it about to undertake — the "search*

*for tax equity"* which defendants prefigure. As defendants themselves recognize, *it is the Legislature which by virtue of institutional competency as well as constitutional function is assigned that difficult and perilous quest. Our task is much more narrowly defined: it is to determine whether the trial court committed prejudicial legal error in determining whether the state school financing system at issue before it was violative of our state constitutional provisions guaranteeing equal educational opportunity to the public school students of this state. If we determine that no such error occurred, we must affirm the trial court's judgment, leaving the matter of achieving a constitutional system to the body equipped and designed to perform that function.* (Emphasis added.)[1]

Second, until this Lake View case was initially filed in 1992, no one filed another or separate lawsuit after *Dupree* to determine if the General Assembly had enacted legislation to make the State's education system constitutional.

This court, in the *Dupree* decision, held that it was the role of the legislative and executive branches to correct the constitutional deficiencies found in Arkansas' public school system, and not the court's role to supervise. That position appeared to be well grounded in the law. *See, e.g., City of Lowell v. M & N Mobile Home Park, Inc.*, 323 Ark 332, 916 S.W.2d 95 (1996).[2] However, when the *Lake View* case came to this court years later, we mentioned the

---

[1] *See also Dupree*, 279 Ark. at 253 (Hickman, J., concurring), as follows:

[T]*his court had no intention of intervening in a legislative or executive atter. Nor do we intend to supervise their work and if the General Assembly takes this opportunity to correct years of habit and starts afresh providing a truly equal formula for dispensing state aid, then there will be no need for this court to speak on this matter again.* We are not a wealthy state but we have the means to provide to every student, both at the secondary and higher level, a decent opportunity for an education. But our assets cannot be squandered by political decisions or unnecessary compromise. (Emphasis added.)

[2] In *City of Lowell*, this court wrote the following:

One branch of government shall not "exercise any power belonging to either of the others, except in the instances hereinafter expressly directed or permitted." Ark. Const. art. 4, § 2. For each branch to operate as constitutionally envisioned, one branch must not be subordinated to either or both of the other branches, and one branch must not take control of one or both of the other branches. The legislative branch has discretion to determine the interests of the public, but the judicial branch has the power to set aside legislation that is arbitrary, capricious, or unreasonable.

*City of Lowell*, 323 Ark. at 336.

*Dupree* case, but simply refused to apply the legal rules and principles announced and relied on by this court in *Dupree.*

In the *Lake View* decision in 2000, *supra,* this court set out the history of the *Lake View* litigation, which commenced in 1992. In that year, the Lake View School District filed suit, wherein it initially successfully contested the constitutionality of Arkansas' public school funding system; the trial court entered its order on November 9, 1994, whereby that court held the system unconstitutional, but stayed the effect of the order for two years. This stay period was intended to give the General Assembly time to *implement* a constitutional system. The trial court set a "compliance hearing" in November 1996, but that date was later extended. In November 1997, Lake View moved for the State to show cause why it should not be held in contempt for failure to comply with the trial court's 1994 order. The trial court, in its final order of August 17, 1998, ultimately dismissed Lake View's motion. This order was described in *Lake View* as follows:

> [The trial court] found that Lake View's fourth amended complaint and show-cause petition were moot because Amendment 74 [passed by voters on November 5, 1996] had changed the standard for the school funding system and allowed funding variances among the school districts. The court stated that the same analysis applies to the legislation passed by the General Assembly in 1995 and 1997. *The court added that Lake View's complaint and show-cause petition should be dismissed for failure to state a claim, because the 1995 and 1997 legislative acts are presumed constitutional* and no facts were alleged supporting lack of a rational basis for those acts. [Emphasis added.] In this regard, the [trial court] noted that Lake View's show-cause petition did assert that findings made in the 1994 Order were violated, but concluded that those findings "*may* necessarily have changed and *may not* be applicable today." [Emphasis in original.]

*Id.* at 492.

Lake View appealed the August 17, 1998, order, and our court reversed the trial court's decision. We agreed with Lake View that the trial court had no basis for its findings without a "compliance trial and decision" on whether the disparities in treatment noted in the trial court's 1994 order have been corrected so as to pass constitutional muster. *Id. This court further held that, without a compliance trial and the trial court's analysis and decision, we were loathe to conclude that mere changes in the school funding system warranted*

*a dismissal. Id.* This court then reversed and remanded the case for the trial court to conduct a compliance trial to take place as soon as possible. The State further suggested that the review of the constitutionality of the State's funding system, based on the above charges, might be an issue best left for another day. We strongly rejected that suggestion, stating that the case "cries" for finality and resolution. The dissent, citing the *Dupree* decision, agreed with the State's opinion that this court held that it had a limited judicial role in these matters and emphasized it is the legislature's role to perform and achieve a constitutional system. *Id.* at 501-502.

On remand, as directed by this court, the trial court promptly set a compliance trial in September and October of 2000. After nineteen days of hearings, the trial court entered its final order on May 25, 2001, which declared the school funding system unconstitutional. At trial, one of the State's initial arguments was based on the separation-of-powers doctrine; and on appeal, the State argued, *as it did below,* that the trial court had violated that doctrine when it mandated the funding of our public schools. The State further submitted that the funding of our public schools is a political question involving public policy and the interplay between the State and local school districts, which is best left to the General Assembly to resolve. The State also urged that the courts should avoid getting "mired down" in endless litigation in an effort to supervise the public schools. In other words, the argument of the State in this *Lake View* litigation mirrored much of what this court held in *Dupree.*

This court rejected the State's arguments, oddly enough, by referring to the *Dupree* holding. *See Lake View Sch. Dist. No. 25 of Phillips County v. Huckabee,* 351 Ark. 31, 91 S.W.3d 472 (2002). Although difficult to understand, the majority court states that it continues to adhere to its opinion in *Dupree* and that court's discussion of the respective roles of the legislative and judicial branches relative to school funding. In an attempt to explain its obvious conflicting positions, the *Lake View* majority makes a veiled attempt to distinguish this case from *Dupree,* stating that the people want *all* departments of state government to be responsible for providing a general, suitable, and efficient system of public education to the children of this State. *Id.* at 53. However, the *Lake View* majority court revealed its true position when it added the following language:

> We reject the State's argument. This court's refusal to review
> school funding under our state constitution would be a complete

abrogation of our judicial responsibility and would work a severe disservice to the people of this state. We refuse to close our eyes or turn a deaf ear to claims of a dereliction of duty in the field of education.

*Id.* at 54.

The *Lake View* majority continued by noting that early on, this court announced that "[t]he people of the State, in the rightful exercise of their sovereign powers, ordained and established the constitution; and the only duty devolved upon this court is to expound and interpret it." *Id.* (quoting *State v. Floyd*, 9 Ark. 302, 315 (1849)). The majority then quoted extensively from the Supreme Court of Kentucky's decision in *Rose v. Council for Better Eduction, Inc.*, 790 S.W.2d 186, 208-10 (Ky. 1989), explicitly adopting the following:

> Before proceeding . . . to a definition of "efficient" we must address a point made by the appellants with respect to our authority to enter this fray and to "stick our judicial noses" into what is argued to be strictly the General Assembly's business.

> \* \* \* \*

> . . . [In this case] we are asked — based solely on the evidence in the record before us — if the present system of common schools in Kentucky is "efficient" in the constitutional sense. *It is our sworn duty to decide such questions when they are before us by applying the constitution.* The duty of the judiciary in Kentucky was so determined when the citizens of Kentucky enacted the social compact called the Constitution and in it provided for the existence of a third equal branch of government, the judiciary.

> \* \* \* \*

> *To avoid deciding the case because of "legislative discretion," "legislative function," etc., would be a denigration of our own constitutional duty.* To allow the General Assembly (or, in point of fact, the Executive) to decide whether its actions are constitutional is literally unthinkable.

> \* \* \* \*

> The judiciary has the ultimate power, and the duty, to apply, interpret, define, and construe all words, phrases, sentences and sections of the Kentucky Constitution as necessitated by the controversies before it. It is solely the function of the judiciary to so do. *This duty must be exercised even when such action services as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public.*

*Lake View*, 353 Ark. at 54-55 (emphasis added).

Having made the foregoing legal declarations and an extensive analysis of the evidence and arguments made by all parties, this court held the State's school-funding system unconstitutional. The court stayed its decision and issuance of mandate until January 1, 2004. The stay was imposed in order to allow the General Assembly and the State time to correct this constitutional disability in public school funding and to chart a new course for public education in this State. In reversing, the majority court, again citing the *Dupree* case, stated that it was "not this court's intention to monitor or superintend the public schools of this state." *Nevertheless, the court further warned that, should constitutional dictates not be followed, as interpreted by this court, we would have no hesitancy in reviewing the constitutionality of the state's school-funding system. Id.* at 98.

That was then; today is now, and, while the General Assembly and the executive department did not meet this constitutional goal by January 1, 2004, definite progress has been achieved. However, the majority court is apparently ready to absent itself from staying around to assure that the State's school-funding system will become constitutional. As if sensing this court's timidity and reluctance to continue as an integral part in forging a constitutional educational system, all parties to this litigation, except the State, request this court to retain jurisdiction until the system meets constitutional standards. Instead, our court has decided to release jurisdiction of this case and issue its mandate. In doing so, the majority uses bold language, such as "The resolve of this court is clear and our commitment to the goal of an adequate and substantially equal education for all Arkansas students is unmistakable. We will exercise the power and authority of the judiciary, as needed, to assure its attainment."

Even assuming its best intentions, this court loses its exclusive control over this litigation once it releases its jurisdiction. For example, parties will predictably file related suits in a federal venue

and other state courts, thereby permitting parties to engage in piecemeal litigation to resolve the same or related issues as those found in the *Lake View* litigation. One must remember that this court has not as yet declared the State's school-funding system constitutional, because there obviously is still more officials must do. However, were this court to retain jurisdiction to see these constitutional and educational issues to their conclusion, there would be little chance other courts could, or would want to act to consider issues already pending in this litigation. Such added litigation addressing related educational questions or issues would only create confusion and cost the State and other interested parties additional costs and fees.

I also question the wisdom of relinquishing jurisdiction when there is, as yet, no firm definition of what constitutes an "adequate" education. The special masters voiced their concern that they had no definition of "adequacy," and this court should share that concern. How can we say that this matter is concluded if we have yet to furnish the definition or yardstick by which an "adequate" education is to be measured?

Furthermore, I harbor grave doubts as to this court's resolve to reenter this controversial lawsuit if later called on to do so. For example, the majority court now embraces the separation-of-powers doctrine to limit and divest this court of jurisdiction. It submits that the court "cannot arrogate to itself control of the legislative branch," or "to serve as a 'watchdog' agency to assure full compliance with this court's *Lake View* decisions. Pardon me, but is this not what our court did when it (1) ruled the State's educational system was unconstitutional, (2) set a compliance date of January 1, 2004, and (3) appointed masters to take testimony and other evidence to determine if the General Assembly's and the executive officials' actions were sufficient to achieve a constitutional education system for all of Arkansas' public school children? We also reviewed the trial court's ruling that, because the General Assembly's legislative acts passed after November of 2002 were presumed constitutional, Lake View no longer had a constitutional claim. Our court disagreed, and held that a compliance trial was necessary to determine if the disparities in treatment were corrected. The same situation is now before us.

Though our special masters have made great progress in obtaining evidence bearing on the underlying disparities in the education system, the question of the constitutional status of

Arkansas' system still hovers over the State and continues to present a cloud over funding issues bearing on our public school system statewide. How will this court possibly know when the State's educational system is constitutional, if it refuses to review the acts of the legislative and executive branches? How can this court know whether those required acts and programs are ever funded and implemented? These implementation and funding questions were posed to counsel at the hearing held to allow the parties to present their objections, if any, concerning the masters' report. Unfortunately, counsel for the parties had no ready answers, largely because, while the General Assembly has taken action to adopt laws needed to bring Arkansas' system into compliance, still more action must be undertaken to fund and implement those acts passed to provide the legislative structure to achieve a constitutional system.

Our court was unanimous in its per curiam order of February 3, 2004, *see* 356 Ark. 1, 144 S.W.3d 741, wherein it appointed Special Masters Bradley D. Jesson and David Newbern *to examine and evaluate legislation and executive actions* taken since this court's decision of November 21, 2002. The purpose of the appointment of the two masters was to assist our court in determining if the legislature's actions comply with this court's order and constitutional mandate. For the first time during this *Lake View* litigation, our court is showing its timidity or weakness to finish what it started in the State's quest to provide a constitutional educational system for Arkansas children.

The majority opinion poses the rhetorical question, if this court continues to monitor, evaluate, and examine over an extended period of time, how long will it take? While the majority acts as though there is no valid, plausible answer to its question, the answer *is* simple — "for as long as it takes to establish a constitutional system." Such rhetoric causes me to wonder if this court has already lost sight of the masters' following cautionary advice and warning:

> Intervenors, Rogers and Bentonville School Districts and Little Rock and Pulaski County Special School Districts, suggest that the court should retain jurisdiction of this case for a limited period to assure a sufficient response by the state to the facilities study or perhaps through the next regular legislative session. In its *amicus curiae* brief the Arkansas Education Association suggest that the

court retain jurisdiction to review the effect that the new legislation has on teachers' salaries. The state strongly objects to those proposals because it fears that the court will become a school monitor in perpetuity. The state also suggests that we, as masters, are not charged with making any recommendation with respect to the court's retention of jurisdiction. We agree that the issue is solely for the court to decide.

We have expressed our major concerns above, with one exception. As the Lake View appellants have observed, that which has been given by the General Assembly may be taken away by the General Assembly. There is no guarantee that the plan that has been initiated in the legislative furor following the court's decision to recall its mandate in *Lake View* [2002] will be followed beyond the 2004-2005 appropriations. *The process of bringing the schools into constitutional compliance will be, as the late Robert A. Leflar said to generations of law students when referring to difficult tasks and situations, "not for the short-winded."*

(Emphasis added.)

It seems proper at this point to ask the relevant question: have we already forgotten Arkansas' own history and experience when this court did nothing to validate our educational system after the *Dupree* court held the public school system unconstitutional twenty-one years ago? This court's empty pledge to reenter this controversial fray, *as needed*, in no way eliminates my doubts or eases my concern as to whether this court will, or whether it even has the authority to do so once it voluntarily relinquishes its jurisdiction. After all, the reason the majority gives for leaving this litigation now is because it perceives the separation-of-powers doctrine dictates the courts doing so. How is this court going to be in any different position in the future? This court can well expect the State to raise the separation-of-powers defense if this court either moves, or is asked to reenter this case. Instead, the people of this state can expect this issue involving the constitutionality of Arkansas' public school system to be relitigated in a future separate lawsuit. This is such a waste of money and time.

I still recall the bravado with which this court spoke when it rejected the State's urging the court to avoid getting "mired down" in endless litigation in an effort to supervise the public schools. As stated earlier in this dissent, this court said, "[T]his court's *refusal to review* school funding under our State constitution would be a complete abrogation of [its] judicial responsibility and

would work a severe disservice to the people of this State. This statement of the court is as true now as it was when the court pronounced it in the 2002 *Lake View* case. Nonetheless, we now appear to do the "unthinkable" and "close our eyes and turn a deaf ear to claims of a dereliction of duty in the field of education." Our children will be the real losers when this opportunity to correct Arkansas' educational system passes us by.

DICKEY, C.J., and CORBIN, J., join this dissent.

DONALD L. CORBIN, Justice, dissenting. I must respectfully dissent from the majority opinion releasing our jurisdiction over this case. I begin this dissent by stating that the last thing I want to do is to become a watchdog over our system of public schools. With that said, however, I cannot condone releasing this court's mandate when we have no way of knowing whether the directives we set forth in *Lake View Sch. Dist. No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002) (*Lake View III*) have been satisfied.

I readily admit that of all the justices on this court, I have been the most openly critical of the General Assembly with regard to its work on the education system. After reviewing the Masters' Report, I now realize that the General Assembly has taken numerous steps to comply with our order to provide the children of this state with a system of public education that is constitutional. And, while the General Assembly's efforts are laudable, this court has no way of knowing at this point whether those efforts satisfy our dictates.

The most obvious problem facing us at this juncture is that while much legislation has been passed, it has not yet been funded, nor has it taken effect. This raises two concerns in my mind. First and foremost is the lack of funding. As a former legislator, I am intimately familiar with the Revenue Stabilization Act. Specifically, the Act divides funding priorities into three distinct categories. Appropriation bills that fall within the first category receive funding priority. Bills that fall into the remaining two categories may or may not receive any funding, depending on what is available in state coffers. At this point, we have no idea what funding priority has been given to the new legislation for education. In other words, some of this legislation that we think will help rectify the constitutional deficiencies in the public education system may be placed into the second, or even third, category for funding priority and never be funded at all.

I am also concerned that while the legislation that has been passed looks good on paper, we have no idea what impact it will have until after it goes into effect, and has been in effect, for a period of time. Unfortunately, we lack the psychic ability to look into the future to determine that this newly enacted legislation will cure the problems with this State's education system. Moreover, we already know that the measures related to facilities and equipment have not been brought to fruition. That is why I am at a loss as to why the majority of this court believes our role in this crisis has been satisfied. By releasing the mandate, the majority essentially sends a message to the General Assembly that it has complied with our opinion in *Lake View III* and that the schools of this state now pass constitutional muster. That is simply not the case.

I do not agree with the position taken by the majority that there is no basis for this court to retain jurisdiction over this case. The majority admits that the steps of recalling our mandate and appointing masters were extraordinary ones, but then attempts to back pedal by implying that we might not have taken those steps had the General Assembly passed the legislation prior to January 1, 2004. What we may or may not have done is irrelevant. The fact remains that we took those actions and now we simply cannot wash our hands of this matter. I also do not agree with the majority that we should simply presume that government officials are going to do what they say they will do. Government officials have been saying that they would remedy the public school system of this state since this court's opinion in *Dupree v. Alma Sch. Dist. No. 30*, 279 Ark. 340, 651 S.W.2d 90 (1983). Twenty-one years later we are still faced with the dilemma that our education system is unconstitutional. Today, however, we have the opportunity to ensure that another twenty-one years do not pass before a remedy is devised, funded, and implemented.

Of course, I realize that we have set the precedent that we can recall our mandate at any time. And, as the majority suggests, if the General Assembly or Department of Education fails to follow through with the changes they have started, that is precisely what will occur. In my opinion, however, the majority is taking the easy way out of this case. The majority implies that by releasing jurisdiction, with the caveat that we may at some point in the future recall it again, we avoid violating separation-of-powers principles. To me, there is no constitutional distinction between announcing the possibility of recalling our mandate and simply

retaining jurisdiction as far as creating separation-of-powers issues. Both actions are certainly extraordinary. The real distinction, however, is that the latter option allows this court to actually determine if there has been compliance with our opinion in *Lake View III*. There can be no doubt that one of this court's functions is to ensure compliance with our orders. This does not equate to an infringement on the legislative or executive functions of government; thus, it does not violate any provision of the separation-of-powers doctrine.

As I previously stated, I do not believe our work here is finished. I do not mean to imply that this court must actively participate in the day-to-day operations of running the public school system. To the contrary, it would seem that the appropriate action for this court to take would be to retain our mandate for a reasonable period of time and, then, once the newly enacted legislation has been funded and implemented, this court should review those measures in order to determine if the constitutional defects have been remedied. Again, I reiterate that this is a position that I do not take lightly, but I feel that it is our duty and responsibility as the highest court in this state to ensure that our orders are followed. While it may place us in an uncomfortable position, it is time for all three branches of government, executive, legislative, and judicial, to coordinate their efforts so that the children of this state can finally be a part of an education system that is constitutionally sound.

I respectfully dissent.

DICKEY, C.J., and GLAZE, J., join.

## SUPPLEMENTAL DISSENTING OPINION ON DENIAL OF REHEARING SEPTEMBER 9, 2004

TOM GLAZE, Justice, dissenting. I would grant rehearing for the same reasons set out in my earlier dissent, and do not reiterate those reasons here.[1] I write only to point out the conflicting

---

[1] *Lake View School Dist. No. 25 of Phillips County v. Huckabee*, Glaze, J., dissenting opinion delivered June 18, 2004.

positions and twisted path the majority has taken in its various opinions and per curiams to reach the conclusion that it must release its jurisdiction of the case.[2] In support of the majority's June 18, 2004, decision to relinquish its jurisdiction in this case, the court concluded that it is not this court's role, under the fundamental principle of separation of powers, to legislate, implement legislation, or serve as a watchdog agency. Moreover, the majority said that it was not this court's role to monitor the General Assembly on an ongoing basis until the educational programs have been completely implemented.

The foregoing restrictive view of this court's authority to exercise jurisdiction in this case is in sharp conflict with other rulings made in earlier opinions and orders handed down in this *Lake View* case. For example, in an earlier opinion rendered on March 2, 2000, in this ongoing litigation, the court said, "We believe that a 'compliance trial' and decision by the [trial] court on whether the disparities in treatment noted in [a] 1994 order have been corrected so as to achieve those goals."[3] Also, in another earlier *Lakeview* opinion rendered in this matter on November 21, 2002,[4] this court adopted language from a Kentucky case[5] which emphasized the need for review in school-funding matters. The Kentucky court stated the following:

> The judiciary has the ultimate power, and the duty, to apply, interpret, define, and construe all words, phrases, sentences and sections of the Kentucky Constitution as necessitated by the controversies before it. It is *solely* the function of the judiciary to so do. *This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public.* (Emphasis added.)

---

[2] *Lake View School Dist. No. 25 of Phillips County v. Huckabee,* 358 Ark. 137, _____ S.W.3d _____ (2004).

[3] *Lake View School Dist. No. 25 of Phillips County v. Huckabee,* 340 Ark. 481, 494, 10 S.W.3d 892, 900 (2000).

[4] *Lake View School Dist. No. 25 of Phillips County v. Huckabee,* 351 Ark. 31, 91 S.W.3d 472 (2002).

[5] *Rose v. Council for Better Education, Inc.,* 790 S.W.2d 186 (Ky. 1989).

In addition, this court did not hesitate to re-establish its jurisdiction over this *Lake View* case when it entered a per curiam order on January 22, 2004, recalling this court's mandate issued in its November 21, 2002, decision. In that same January 22 per curiam, this court appointed special masters *to examine and evaluate both legislative and executive actions* since November 21, 2002, to comply with this court's order and constitutional mandate that the State maintain a general, suitable, and efficient system of free public schools. *This court instructed the masters to focus on what steps the legislative and executive branches had taken to bring the State's educational system into compliance since this court's November 21, 2002, opinion.*

From the above, it is difficult to understand why this court appointed special masters in the first place if it believed it was a breach of the separation-of-powers doctrine for the court to monitor, check, and evaluate the legislative and executive actions when determining if those actions had brought Arkansas' educational system into compliance with the State's constitution. How can one answer this constitutional issue without checking or evaluating the work performed by the legislative and executive officers? This court adopted the use of "compliance hearings" for this very reason, even though now the court claims (or suggests) such hearings violate the principle of separation of powers.

In sum, this court's decision to remove itself from this case falls short of meeting its duties and responsibilities under the constitution. In fact, the people and children of Arkansas are left with an education system that has been ruled unconstitutional by this court in its opinion of November 21, 2002. As the court said then (and it remains true now), "The public schools of this state cannot operate under this constitutional cloud and were the [court] not to stay the mandate . . . every dollar spent on public education in Arkansas would be constitutionally suspect."

While this court has steadfastly held from 1983 to date that Arkansas' education system has been and is unconstitutional, it simply fails to come to grips to assure the system will ever become constitutional. The special masters' report and the majority court's June 18, 2004, opinion clearly set out what deficiencies need to be resolved to bring our education system into compliance with the State's constitution. We should allow the masters to complete their work with the help and cooperation of the other two branches of

government. This is not the time for the court to quit the race. The finish line is too close. In the beginning of this litigation, the court held the view that it was not a violation of the separations-of-powers doctrine to conduct a compliance hearing to examine, check, and evaluate the actions of the other two governmental branches. This court should now give itself the time to discharge its duties and review the legislative and executive offices' work, and allow itself reasonable time to make a reasoned and final opinion regarding the constitutionality of our educational system. As matters stand now, the majority court has addressed in detail the reasons why the State's educational system is unconstitutional, but at the same time, it fails to spell out the consequences that will result from the State's continued operation of an unconstitutional education program. At the least, the court should stay its mandate until the next General Assembly meets and then adjourns in 2005, so this court can render a final opinion on this vital constitutional issue.

DICKEY, C.J., and CORBIN, J., join this dissent.