LAKE VIEW SCHOOL DISTRICT NO. 25 of Phillips County, Arkansas, *et al.* *v.* Governor Mike HUCKABEE, *et al.*

01-836                                      220 S.W.3d 645

Supreme Court of Arkansas
Opinion delivered December 15, 2005

*Sharpe, Beavers, Cline & Wright*, by: *Brad Beavers*, for appellant, Barton-Lexa School District, successor in interest to Lake View School District; and amicus curiae, Forrest City School District.

*Friday, Eldredge & Clark*, by: *Christopher J. Heller*, for appellant, Little Rock School District.

*Matthews, Campbell, Rhoads, McClure, Thompson & Fryauf, P.A.*, by: *David R. Matthews*, for appellant, Rogers School District.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *M. Samuel Jones, III*, for appellant Pulaski County Special School District.

*Mike Beebe*, Att'y Gen., by: *Tim Gauger*, Sr. Ass't Att'y Gen., and *Mark Hagemeier*, Ass't Att'y Gen., for appellee, Governor Mike Huckabee.

*Wilson Law Firm, P.A.*, by: *E. Dion Wilson*, for amici curiae, Earle School District and Helena-West Helena School District.

*Sharon Street*, for amici curiae, DeQueen School District, et al.

*Barrett & Deacon*, by: *D.P. Marshall Jr.*, for amici curiae, Arkansas State Chamber of Commerce and Associated Industries of Arkansas, Inc.

R OBERT L. BROWN, Justice. Before this court is the motion by Intervenors Rogers School District No. 30, Barton-Lexa School District, Little Rock School District, and Pulaski County Special School District, filed October 24, 2005, for action upon the Special Masters' Report. Previously, Rogers School District and others moved this court to recall its mandate, reappoint masters, and order the State Defendants to show cause why they should not be held in civil contempt for failure to comply with this Court's previous

orders, which we granted on June 9, 2005.[1] A total of forty-nine school districts so moved or joined in at least part of that original motion as intervenors or *amici curiae* (hereinafter collectively referred to as Rogers School District).

By our decision on June 9, 2005, we granted part of Rogers School District's original motion by recalling the mandate in this case and by reappointing Bradley D. Jesson, former Chief Justice of the Arkansas Supreme Court, and David Newbern, a former justice of the Arkansas Supreme Court, to file a report and make findings of fact regarding the following issues, in addition to any other issue they deemed relevant to the State's constitutional compliance:

> (1) this court's jurisdiction to hear the instant motions;

> (2) whether the General Assembly at its 2005 regular session retreated from its prior actions to comply with this court's directives in *Lake View Sch. Dist. No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002), particularly with respect to the General Assembly's actions or inactions in relation to Act 57 and Act 108 of the Second Extraordinary Session of 2003;

> (3) whether the foundation-funding levels for the next biennium assure a continual level of adequate funding for Arkansas students; and

> (4) whether the General Assembly's commitment to facilities funding meets the adequacy criterion.

On October 3, 2005, the Masters filed an 83-page report with this court which addressed the issues requested, as well as other issues they deemed relevant, and made findings of fact. On October 24, 2005, Rogers School District filed the instant motion requesting this court to adopt the Special Masters' findings of fact and recommendations, to call upon the Governor to convene a special session of the General Assembly for curative legislation, and

---

[1] The State Defendants include the Governor, State Treasurer, State Auditor, Director of the Department of Finance & Administration, President Pro Tempore of the Senate, Speaker of the House of Representatives, Director of the Department of Education, Arkansas Department of Education, and the Arkansas State Board of Education and its members, all in their official capacities.

to rule certain acts of the 2005 legislative session unconstitutional as violative of the equal-protection sections of the Arkansas Constitution. Rogers School District further asked this court to retain jurisdiction of the case to assure compliance.

We express our sincerest appreciation to former Chief Justice Bradley Jesson and former Justice David Newbern for the exceedingly thorough analysis they performed in response to this court's charge set out in our *per curiam* order dated June 9, 2005. The dedication and commitment they have shown to the task at hand are truly exemplary. The court is profoundly grateful for the work they performed.

We begin with a summary of the salient findings of fact and conclusions of law made by the Masters in their report and follow with our opinion in this matter.

## I. Masters' Report

### A. Masters' Findings of Fact

#### 1. Foundation Funding

The Masters found that basic foundation funding for school districts for the 2005-2006 school year was calculated by using $5,400 for each student multiplied by the average daily membership of the school district for the *previous* school year.[2] This was the same foundation funding for the 2004-2005 school year.

Act 59 of the Second Extraordinary Session of 2003 set forth the funding formula for the 2004-2005 school year. Act 2283 of 2005 did not increase the $5,400 foundation-funding amount for the 2005-2006 school year. Act 2283 did increase the figure for the 2006-2007 school year by $97 for a total of $5,497.

Act 1426 of 2005 requires that each school district dedicate nine percent of its total foundation funding, or $486 of the $5,400 amount, for utilities, custodial costs, maintenance and repair, renovation, and related personnel costs. The act effectively limits

---

[2] Of the $5,400 per student calculation, $3,415 was calculated for teacher salaries, and $789 was included for computer hardware and software, instructional materials, supervisory aids, and other matters. The foundation-funding figure of $5,400 also included $1,152 for "carry forward" funding which included money for such things as administrative expenses, athletics, transportation, and non-instructional and technological services.

the use of the funds so that they cannot be used for other expenses such as increased transportation costs.

### 2. Uniform Rate of Taxation — Amendment 74

Amendment 74 established the uniform rate of taxation of twenty-five mills for each school district to be levied on the assessed value of property and to be used solely for the maintenance and operation of the schools. The revenues collected are sent to the State, and the State later distributes the total funds back to the school district.

The twenty-five mills uniform rate of taxation and the net revenues it generates are elements of the formula used to determine the amount of state foundation aid. The report says: "That amount [foundation aid] is computed as 'the difference between the foundation funding amount [which is set at $5,400 per student multiplied by the average daily membership of the school district for the previous school year] . . . and the sum of ninety-eight percent (98%) of the uniform rate of tax multiplied by the property assessment of the school district plus seventy-five percent (75%) of miscellaneous funds of the school district.' " *See* Ark. Code Ann. § 6-20-2305(a)(1) (Supp. 2005).

The 2% difference between 98% and 100% in § 6-20-2305(a)(1) is said to be the cost of collecting the local tax, although, according to testimony before the Masters, that cost can exceed the two percent figure. In addition, the actual collection of local revenues can be lower than 98% of the uniform rate of tax multiplied by the property assessment for the school district.

The uniform rate of taxation is estimated to reflect an increase of $39 million in the 2005-2006 school year from that of the 2004-2005 school year. This potential increase in local revenues results in a corresponding reduction in state foundation aid needed to make up the $5,400 per student.

### 3. Categorical and Professional Development Funding

#### a. Alternative Learning Environment (ALE) Funding

Categorical funds are available in addition to the foundation funding for programs like the Alternative Learning Environment for "at risk" students, where the State provides funding of $3,250 multiplied by the number of identified ALE students. There was

no increase in funding in this category for the 2005-2006 and 2006-2007 school years.

### b. English Language Learners

Act 2283 of 2005 provides that for the school years of 2005-2006 and 2006-2007, funding for the English language learners is $195 for each eligible student. This represents no increase from the 2004-2005 school year. The Masters found that children from non-English speaking homes have greater educational needs than those from English-speaking homes. The legislative committees made no inquiry to school superintendents about the funding needs for the English language learners prior to or during the 2005 session.

Insufficient funding for this program requires National School Lunch Act revenues to be used to support this program.

### c. National School Lunch Act

Additional funding under Act 59 of the Second Extraordinary Session of 2003 for students eligible under the National School Lunch Act was based on the number of students eligible. In 2005, the General Assembly amended Act 59 by Act 2283 and, in doing so, changed the method of counting students who qualified for additional funds. This caused a decrease of $9,542,400 in the money spent on behalf of school-lunch students in the 2005-2006 school year. The funding for NSLA students does not account for any increase or decrease in the average daily number of the students for the current year.

### d. Professional Development

Professional development funding supports a coordinated set of planned learning activities for teachers and administrators. This funding was reduced from $50 multiplied by the previous year's average daily membership (ADM) for school year 2004-2005 to a projected $41.11 multiplied by the previous year's ADM for school year 2005-2006. The difference in funding may be due to funding provided to the Arkansas Educational Television Network to develop an online professional-development program for teachers.

## 4. COLA

No cost-of-living adjustment (COLA) was added to the foundation-funding amount of $5,400 per student for the 2005-2006 school year. A COLA had been recommended by personnel

at the Department of Education and at the Department of Finance and Administration of 1.875%, which would have raised the $5,400 figure by $101 at a cost of $45 million. Though foundation funding did not receive a cost-of-living adjustment, all state employees did receive such an increase, including members of the General Assembly.

Various explanations were given to the Masters at the hearings for the failure to add the COLA for 2005-2006: (1) $35,000,000 was provided for the teacher health-insurance fund; (2) the General Assembly lacked sufficient information that would indicate it was warranted; (3) the COLA money was "[S]hifted . . . into facilities;" and (4) the General Assembly wanted to see how the $380 million in newly appropriated funds for 2004-2005 for K-12 had been spent.

The General Assembly had $52 million in the General Improvement Fund, from which thirty-five senators were allotted $750,000 each to fund projects of their choosing.

### 5. Unfunded Mandates

School districts faced new expenses due to acts passed during the 2005 session that were not funded, which were described as "unfunded mandates." According to James Gilson, Special Assistant to the Executive Director of the Arkansas School Boards Association, increased costs due to these mandates will be $244 per student in the 2005-2006 school year and $215 per student in the 2006-2007 school year. The Masters found that there are increased financial burdens on school districts "from some of the mandates, but, if nothing else, as a result of inflation." Fuel costs "are going up tremendously" and textbook costs have "skyrocketed." Again, foundation funding was frozen at $5,400 per student for the 2005-2006 school year; yet the school districts' financial obligations were increased by the General Assembly.

Examples of unfunded mandates noted by the Masters are annual step increases in salary schedules for certified employees, costs due to the implementation of annual Academic Improvement Plans, increases in minimum teacher salaries in 2006-2007, and a potential increase in contributions to teacher retirement in 2006-2007. The Masters found that there is a "lack of evidence" that the legislature made an informed decision as to whether there was adequate money to address these new costs.

### 6. Health-Insurance Funding

By Act 2282 of 2005, $35 million in new money was added for the public school employees' health-insurance program. According to the testimony at the Masters' hearings, this was to increase the state's premium subsidy and to keep the health-insurance program from collapsing.

### 7. Bonded Debt as of January 1, 2005

State funding for repair, renovation, and construction of academic facilities currently occurs through three programs: (1) Debt Service Funding Supplement; (2) General Facilities Funding; and (3) Supplemental Millage Incentive Funding.

According to the first run of 2006 Public School Funding which occurred on July 13, 2005, total funding for the three programs will be reduced by $1,795,985. Thus, although a number of school districts have existing facilities-related bonded debt, state assistance has been "unexpectedly reduced." It is unclear whether any portion of the 2005-2006 bonded debt assistance/Debt Service Funding Supplement state aid may be restored to any district upon a showing that the debt "is not attributable to the support of non-academic facilities."

### 8. Facilities

With respect to facilities, the Masters noted several legislative acts enacted by the General Assembly in 2003 and thereafter:

- Act 1181 of 2003 created the Joint Committee on Educational Facilities to recommend to the General Assembly what was needed to provide adequate and substantially equal educational facilities.

- In June 2003, the Joint Committee created a Task Force on Educational Facilities to assist it. Ten million dollars was appropriated for a statewide facilities assessment. All educational facilities in the state were inspected and assessed.

- On November 30, 2004, the Task Force listed total facility-condition costs at $2,278,200,457. On February 22, 2005, the Task Force filed an addendum to the report showing total facility-condition costs at $1,930,142,412. Priority One for safe, dry, and healthy facilities showed a cost of $205,342,568. No inflation factor was built into these costs.

- The total appropriation for state-assisted facilities funding for the current biennium ending June 30, 2007, is $120 million. This appropriation does not include funds for Enrollment Growth Costs estimated to require anticipated construction costs of $361,769,048 during the five-year 2004–2008 period for 25,761 new students, equating to approximately $72 million a year.

- Act 1327 of 2005 created an independent body, the Commission for Arkansas Public School Academic Facilities and Transportation. The Facilities Commission consists of the Director of the Department of Finance and Administration, the President of the Arkansas Development Finance Authority, and the Commissioner of the Department of Education. The Facilities Commission is over the Division of Public School Academic Facilities and Transportation which is to carry out the development and implementation of the Arkansas Public School Academic Facilities Program. The Facilities Commission expires July 1, 2007, and, at that time, its oversight powers and responsibilities will be transferred to the State Board of Education.

- Act 2206 of 2005 created the Arkansas Public School Academic Facilities Funding Act which defines the academic facilities wealth index used to determine the percentage of financial participation attributable to the State and school district for facilities projects. If the school district cannot fund its share of the costs for a project, the State will not participate in it. The facilities needs of a school district do not factor into the facilities wealth index formula. This means that despite the facilities needs of some school districts, no state money will be available, in some cases, to meet those needs under the wealth index.

- Act 1426 of 2005 is the Arkansas Public School Academic Facility Program Act which was passed to provide constitutionally appropriate public school facilities for every child. Because of the wealth index formula, every school district must bear part or all of its facilities expense. If the school district cannot meet the required contribution, the needed facilities will not be repaired or replaced. There is no legislative provision for the State to pay the entire cost of facility repair or construction, no matter how great the need.

- Act 2206 also established the Academic Facilities Immediate Repair Program for school facilities. The program is considered a one-year program and is designed to correct an immediate

hazard to health and safety. Examples of such projects include heat and air systems, floors and roofs, fire alarm systems, or a life-safety code requirement. $20 million was appropriated for fiscal year 2005-2006. No funds were appropriated for the next fiscal year, 2006-2007. One hundred and forty-eight school districts applied for the funds by July 1, 2005, requesting approximately $82 million in funding. If all are approved, the State's share of the requested projects costs is estimated at $40 million, which is approximately twice the amount of funds appropriated.

- Under Act 2206, the State may transfer funds from the Transitional Academic Facilities Program to the Immediate Repair Program. $50 million was appropriated for this program in fiscal year 2005-2006, but no funds were appropriated for fiscal year 2006-2007. The Transitional Program is primarily for new construction, but the rules for this program will not be developed until December 1, 2005. Thus, school districts must proceed with new construction without knowing whether they qualify for these funds.

- Act 2206 also created the Academic Facilities Partnership Program and $50 million has been appropriated for fiscal year 2006-2007, but no funds have been appropriated for the 2005-2006 fiscal year. This is a continuing program for new construction. The school districts will apply for funds before construction commences and will know the amount of state participation. The State and school district will enter into a partnership agreement, under which the State will have no participation if the school district cannot raise local resources towards the project. School districts will be notified of the estimated amount of state financial aid for an approved project no later than May 1, 2006.

- Act 1426 of 2005 requires each school district to develop and submit a ten-year disrictwide facilities master plan for review and approval of the Facilities Division by February 1 of each even-numbered year. The plan, due February 1, 2006, shall describe new construction and cost estimates.

- Act 1426 also requires the Facilities Division to develop a comprehensive state master plan for state financial participation in local academic facilities projects.

## 9. Compliance with Act 57

Act 57 of the Second Extraordinary Session of 2003 provides that the General Assembly has a "continuing duty to assess what

constitutes an adequate education[.]" Reports shall be filed by the House and Senate Interim Committees on Education with the Speaker of the House and President of the Senate by September 1 of each year before a regular session to comply with this act.

The General Assembly fixed the foundation-funding amount at $5,400 for the 2004-2005 school year. The Masters concluded that Act 57 prescribes a framework for the General Assembly to determine foundation funding for subsequent years, but that "[a]n Act 57 review and report were not performed" before the 2005 regular session.

The Masters further concluded that there was "no evidence that the General Assembly attempted to comply with Act 57 and was thwarted by the lack of information." At the hearings before the Masters, the State raised a new argument that Act 57 did not apply to the 2005 regular session and that the adequacy study conducted in 2003 met the requirements of Act 57 for the session.

The General Assembly was obligated to ascertain a foundation-funding amount for the 2005-2006 school year, according to the Masters. No hearings were conducted by the interim committees, and the Department of Education was never asked to furnish any information. At the end of the 2005 regular session, the decision was made to freeze the foundation amount at $5,400 for the 2005-2006 school year and to provide a $97 increase for the 2006-2007 school year. There was no testimony to the interim committees that either figure was adequate.

In addition, several problems and concerns with the foundation-funding formula were discovered during the Masters' hearings, including:

- differences in actual tax collections at the local level versus property assessments;

- the impact of losing students in a school district on foundation funding and aid;

- the limitations on the designated use of portions of the foundation funding; and

- the impact of unfunded mandates and inflation.

## 10. Surplus Funds

The actual surplus of state revenues at the end of the 2004-2005 fiscal year, according to the Department of Finance and

Administration, was $307,217,154. Of that surplus, $107,800,000 remains in unallocated money. The Department of Finance and Administration forecast for the surplus at the end of the 2005-2006 fiscal year is $98,900,000, and for 2006-2007 is $68,700,000.

The Director of the Department of Finance and Administration estimated the unappropriated surplus in the Educational Adequacy Trust Fund at $49,000,000.

## B. Masters' Conclusions

In the end, the Masters found that the State has not lived up to its promise to make education the State's first priority. See Act 108 of the Second Extraordinary Session of 2003. According to the school superintendents who testified at the hearings before the Masters, this has adversely affected efforts to provide an adequate education to the children of this state. The Masters so found.

The Masters further found that the failure to comply with Act 57 and to increase foundation funding from $5,400 for the 2005-2006 school year was difficult to defend in light of inflation and spending requirements. In addition, they found that the $35 million for teachers' health-insurance premiums was a "good thing," but that its effect on education was "indirect at best[.]"

Based on the testimony of the superintendents, the Masters concluded that more funding was necessary so as to avoid the status of "fiscal distress." With respect to facilities, the Masters concluded that a school district's financial responsibility was so great for it to enter into a partnership with the State for construction and repairs that many school districts will be unable to raise the required funds and thus will be forced to forego needed construction and repairs. The Masters also concluded that the $120 million appropriated for the biennium for facilities does not "come close to addressing the [S]tate's public-school facilities needs."

As a final point, the Masters stressed that adequacy matters have already been sufficiently studied by outside consultants and pointed to the fact that there exist substantial amounts of unallocated surplus funds to meet the state's educational needs.[3]

---

[3] The allusion to outside consultants is apparently a reference to Act 723 of 2005, which amended Act 57 to allow for the hiring of outside consultants "to conduct the adequacy review as required under this section."

## II. Court's Opinion

### A. Pending Motions

Two motions have been filed by the Intervenors. The first is a motion to strike the State Defendants' post-Masters' Report brief. Specifically, the motion seeks to strike the State's arguments regarding justiciability and the separation of powers. We deny the motion and discuss the justiciability point raised by the State Defendants below.

The second motion filed by the Intervenors asks this court to take judicial notice of certain items filed in federal district court relating to the Pulaski County desegregation case. We decline to do so.

### B. Justiciability

The State Defendants spend much of their time in their post-Masters' Report brief arguing that this court should reverse its previous holding in this case and rule that the adequacy-of-state-funding issue is a nonjusticiable political question. The State Defendants make this argument despite the fact that this court rejected the same argument in 2002. *See Lake View Sch. Dist. No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002). At that time, we emphasized that the justiciability point had already been decided in an earlier case, *DuPree v. Alma School Dist. No. 30*, 279 Ark. 340, 651 S.W.2d 90 (1983).

We further emphasized that the Education Article in the Arkansas Constitution speaks in terms of the State maintaining a general, suitable, and efficient system of public schools — not the General Assembly. *See* Ark. Const. art. 14, § 1. We concluded:

> We reject the State's argument. This court's refusal to review school funding under our state constitution would be a complete abrogation of our judicial responsibility and would work a severe disservice to the people of this state. We refuse to close our eyes or turn a deaf ear to claims of a dereliction of duty in the field of education. As Justice Hugo Black once sagely advised: "[T]he judiciary was made independent because it has . . . the primary responsibility and duty of giving force and effect to constitutional liberties and limitations upon the executive and legislative

branches." Hugo L. Black, *The Bill of Rights*, 35 N.Y.U. L. Rev. 865, 870 (1960).

*Lake View*, 351 Ark. at 54, 91 S.W.3d at 484.

■ Not only do the State Defendants raise an argument already decided *in the same case*, but they cite many of the same cases previously analyzed and discarded by this court in our 2002 opinion. *See, e.g., Ex parte James*, 836 So. 2d 813 (Ala. 2002); *Marrero v. Commonwealth of Pennsylvania*, 559 Pa. 14, 739 A.2d 110 (1999); *Coalition for Adequacy & Fairness in School Funding v. Chiles*, 680 So. 2d 400 (Fla. 1996); *Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 672 N.E.2d 1178 (1996); *City of Pawtucket v. Sundlun*, 662 A.2d 40 (R.I. 1995). The State now demands that the court replow the same ground. The "new" authority adduced by the State Defendants in support of their argument is composed of two trial court orders from the State of Nebraska, which has different language respecting education in its state constitution. We reject this argument once more as having no merit.

### C. Governor Huckabee and the General Assembly

While this court adopts most of the Masters' Report, we do not do so *in toto*. At one point in the Report, the Masters make the following comment in connection with the issue of school-district consolidation: "The governor is no longer actively participating in this case." They further say that the serious inefficiencies which result from having 250 school districts "has been ignored or forgotten by the General Assembly."

These conclusions are decidedly outside of the scope of the Masters' charge, and we disassociate ourselves from the statements. While we agree that there are deficiencies in the work done during the 2005 regular session, as discussed below, we view the governor and senators and representatives as dedicated public servants who are striving to meet the educational goals of this state. Indeed, we praised their efforts in 2004 as "laudable." *See Lake View Sch. Dist. No. 25 v. Huckabee*, 358 Ark. 137, 189 S.W.3d 1 (2004).

### D. Act 57

We agree with the Masters' finding that the linchpin for achieving adequacy in public education is the General Assembly's compliance with Act 57 of the Second Extraordinary Session of

2003.[4] Without a continual assessment of what constitutes an adequate education, without accounting and accountability by the school districts, without an examination of school district expenditures by the House and Senate Interim Committees, and without reports to the Speaker of the House and the President of the Senate by September 1 before each regular session, the General Assembly is "flying blind" with respect to determining what is an adequate foundation-funding level.

A review of the Masters' Report before us reveals that the General Assembly failed to comply with Act 57 prior to the 2005 regular session. Notably, the Masters concluded that the interim committees made no request to the Department of Education for any information before the 2005 regular session, or even during that session. Thus, vital and pertinent information relating to existing school district revenues, expenditures, and needs was not reviewed. Without that information, the General Assembly could not make an informed funding decision for school years 2005-2006 and 2006-2007. We have no doubt that the decision to freeze the previous year's figure of $5,400 for purposes of 2005-2006 is a direct result of this lack of information.

Why did the General Assembly not garner the information in compliance with Act 57? Many reasons are given, but irrespective of those reasons, we are convinced of two things. First, that information is now clearly available. Secondly, this court is not willing to place the issue of an adequate education on hold for the current school year and the next and do nothing with respect to foundation and categorical funding levels, which are integral to public school equality and adequacy. To do so would simply be to "write off" two years of public education in Arkansas, which we refuse to do.

---

[4] Under the "Purpose" section of Act 57, it is the General Assembly's responsibility to know how state revenues are being spent and to assess continually "what comprises an adequate education in Arkansas." The specific duties of the General Assembly outlined in the act include the duty to assess, evaluate, and monitor the entire spectrum of public education across the state and to evaluate the amount of state funds needed based on the cost of educational opportunity and adequacy. The amount of funding shall be based on need and not funds available. The House and Senate Interim Committees on Education are given investigatory authority over all schools and state agencies involved in education and have subpoena power. The two committees must report their findings and recommendations to the President Pro Tempore of the Senate and the Speaker of the House no later than September 1 before convening a regular session.

We are aware that by Act 723 of 2005, the General Assembly amended Act 57 to allow for the hiring of consultants by the interim committees "to conduct the adequacy review as required under this section." It is unclear whether Act 723 turns adequacy review totally over to consultants. Be that as it may, any such review for 2005-2006 and 2006-2007 for purposes of foundation funding has been thwarted by legislative inaction.

Finally, whether a cost-of-living adjustment to the foundation-funding amount is needed is impossible to gauge when there was no compliance with Act 57. We find it troubling, nonetheless, that COLAs were added to the salaries of all state employees, ostensibly to meet the pressures of inflation, while no such adjustment was made to public school funding.

## E. Other Deficiencies

We adopt the Masters' Report as it pertains to findings of other deficiencies directly related to the constitutionality of Arkansas' school funding system and discuss those deficiencies *seriatim*:

1. Education needs were not funded first, as required by Act 108 of the Second Extraordinary Session of 2003.[5] Rather, foundation-funding aid, as well as categorical funding, were established based upon what funds were available — not by what was needed. In this regard, inflation and unfunded mandates listed in the Masters' Report were not specifically addressed by the General Assembly. It seems patently clear to this court that new funds may be necessary to meet some, if not all, of these unfunded mandates.

2. Facilities funding, by all appearances, falls short. Only one half of the needed state funds for the one-year Immediate Repair Program was appropriated (approximately $20 million versus the $40 million needed) to correct deficiencies in facilities that present an immediate hazard to health and safety. While we recognize that transitional funds are available for transfer to the Immediate Repair Program, no funds were appropriated for either

---

[5] Act 108 creates the Educational Adequacy Fund to fulfill the financial obligation of the State to provide an adequate educational system in conjunction with other resources and accounts available to the Department of Education. In the event these resources are not sufficient to provide an adequate educational system for the state, the additional amount required will be taken from other state funds and fund accounts on a proportionate basis so that the result is a fully-funded system of public education.

the Immediate Repair Program or the Transitional Program for 2006-2007. Priority One facilities construction and repair for safe, dry, and healthy facilities identified by the Task Force on Educational Facilities showed a cost of $205,342,568, where total facilities funding for the current biennium is $120 million. Should the State delay in commencing Priority One construction and repairs, the ultimate cost in terms of deterioration and disrepair will be significant. The Masters went further and underscored that the facilities needs of certain school districts may never be met due to the requirements of the academic facilities wealth index formula which may negate a local partnership.

3. The amount of the State's foundation aid is based in part on local revenues. The uniform rate of taxation for local revenues is tied to the assessed value of real property within a school district. While actual collection of local revenues may be lower, state foundation aid will not increase. The result is that state foundation aid and local revenues for some school districts may leave school districts with less than $5,400 per student. Such a result runs directly counter to substantial equality and adequacy.

4. The General Assembly froze the categorical funding for 2005-2006 and 2006-2007 for Alternative Learning Environment and English Language Learners. In conjunction with this, because of changes in counting National School Lunch Act qualifying students and decreasing enrollments in some school districts with a high number of NSLA qualifying students, NSLA funding will be reduced. This has a direct impact on remedial and mentoring programs, literacy and math coaches, counselors, school nurses, teachers, and homework hotlines since NSLA funding has been used to support these programs.

5. The Masters found other examples of unintended consequences that further affect the economic stability and adequacy of school districts. They underscored that when a school district loses students, its foundation funding is decreased for the following year though salary costs and personnel costs remain unchanged and are ongoing for the following year. They further alluded to "the seeming impossibility of solving the perpetual inequities of teacher salaries" between poor and wealthy school districts.

### F. Conclusions

Just as we decided in 2004, we conclude that we have jurisdiction to recall our mandate and address the motions filed by

the Rogers School District. *See Lake View Sch. Dist. No. 25 v. Huckabee*, 355 Ark. 617, 142 S.W.3d 643 (2004).

With respect to the remaining issues addressed by the Masters, we hold that the General Assembly failed to comply with Act 57 and Act 108 in the 2005 regular session and, by doing so, retreated from its prior actions to comply with this court's directives in *Lake View Sch. Dist. No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002). We further hold that the General Assembly could not have provided adequate funding for the 2005-2006 and 2006-2007 school years as it made no effort to comply with Act 57 and to determine what adequate funding should be. To argue that inaction under Act 57 may equate to adequacy, as the State seems to maintain, does not thread the needle of either logic or reason. In connection with facilities funding, we hold that appropriations for the Immediate Repair Program and Priority One facilities construction and repair for safe, dry, and healthy facilities were grossly underfunded and, thus, inadequate.

To assure an adequate education for the school children of this state and a substantially equal educational opportunity, which the Arkansas Constitution demands, the procedures set forth in Act 57 and Act 108 must be complied with forthwith. Otherwise, a two-year hiatus in educational adequacy will result. As part and parcel of this adequacy analysis, we call upon the General Assembly to address the deficiencies listed above.

While we recognize that failures in the process due to noncompliance with Act 57 and Act 108 are evident, this court does not direct the General Assembly to appropriate a specific increase in foundation or categorized funding amounts, as requested by the Rogers School District. Whether an increase is necessary is for the General Assembly to determine, after its compliance with existing legislation and its assessment of the relevant information necessary for fixing funding levels in the current biennium, including available revenues, surplus funds, and expenditures by the school districts.

Because we hold that the public school-funding system continues to be inadequate, we further hold that our public schools are operating under a constitutional infirmity which must be corrected immediately. We have held in the past that the General Assembly and Department of Education should have time to cure the deficiencies, and we do so again. We stay the issuance of our

mandate until December 1, 2006, to allow the necessary time to correct the constitutional deficiencies.

We emphasize once more that it is the *State* that must provide a general, suitable, and efficient system of public education to the children of this state under the Arkansas Constitution. The roles of the executive and legislative branches are integral to assuring that this transpires. But it is also the duty of this court to assure constitutional compliance when compliance is challenged and to assure that the will of the people of our state as expressed in our constitution is fulfilled. We will perform that duty.

Granted in part. Denied in part.

Motion to Strike State's Brief denied. Motion to Take Judicial Notice denied.

GLAZE, J., and SPECIAL JUSTICE DALBY, concur.

HANNAH, C.J., and GUNTER, J., dissent.

IMBER, J., not participating.

TOM GLAZE, Justice, concurring. I join the majority, but wish to make a point that has not been emphasized but that I think should be. Our court has made it clear that compliance with Act 57 of the Second Extraordinary Session of 2003 must be had in order for Arkansas's educational system to be declared constitutional. However, if compliance is not achieved, this court, under Act 108 and Ark. Const. art. 14, § 1, is provided a means to enforce these matters so that compliance may be attained.

All agree that the legislative, executive, and judicial branches have important roles in assuring that this State's children have an educational system that meets constitutional muster under Ark. Const. art. 14, § 1. Our General Assembly and executive bodies are working to provide such a system, but it is obvious that this goal has eluded us so far. This is not to say our state public officials have not made strides to achieve our constitutional goal.

While the General Assembly, along with the Governor and appropriate executive officials, continue to make strides toward making Arkansas's educational system adequate under Article 14, more still needs to be done. For example, the Masters set forth the following ten areas that require further attention:

- the level of foundation funding was not increased for the 2005-2006 school year;

- the estimated increase in the uniform rate of taxation for foundation funding equates to a $39,000,000 reduction in state foundation funds;

- there was no increase in the amount of categorical funding for the 2005-2006 and 2006-2007 school years;

- no cost-of-living adjustment (COLA) was added to the foundation funding amount of $5,400 per student for the 2005-2006 school year;

- unfunded mandates increased the financial burden on school districts;

- an infusion of $35 million into the public school employees' health insurance program was necessary to keep the program from collapsing, but there was no evidence that the $35 million provided any additional monies to school districts to cover their costs;

- state assistance with bonded indebtedness has been reduced;

- the State failed to appropriate half of the funds necessary to fund the Immediate Repair Program for schools with facilities needs;

- the State failed to comply with the requirements of Act 57, which requires that interim reports, assessing the adequacy of the State's educational system, be filed with the Speaker of the House and President of the Senate by September 1 of each year before a regular session; and

- it is estimated that some $49 million in unallocated surplus remains in the Educational Adequacy Trust Fund.

Although the State seems to disagree with the Masters' Report, which lists these areas of concern, the State failed to offer any testimony, evidence, or argument to contradict the Masters' findings on these vital issues — particularly with regard to the Masters' conclusion that the State failed to comply with Act 57. Consequently, by staying the mandate and giving the General Assembly time to carry out its constitutional duties, our court seeks further proof of the legislature's willingness to correct these specific issues, along with any others that may stand in the way of

achieving the goal of a constitutional system of education for children in Arkansas's public schools.

Much has been said about whether the legislature has sufficiently complied with Act 57, but we trust that the legislature will work to acquire the information required by that Act. In addition, we point out the importance of the General Assembly's good faith action when it enacted Act 108 of the Second Extraordinary Session of 2003 in an attempt to ensure compliance with this court's directives.[1] However, should the officers mandatorily charged with the performance of various tasks under Act 108 fail in their appointed duties, this court would be in a position to enforce the performance of those official duties. In addition, Article 14 of the Arkansas Constitution clothes the judiciary with the authority to enforce the constitutional requirements of an equitable and adequate school funding system, as this court noted in *Lake View School District No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002):

> We further observe that the Education Article in the Arkansas Constitution designates the *State* as the entity to maintain a general, suitable, and efficient system of free public schools:
>
>> Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the *State* shall ever maintain a general, suitable and efficient system of free public schools and shall adopt all suitable means to secure to the people the advantages and opportunities of education.

---

[1] Act 108 of the Second Extraordinary Session of 2003 provides, in relevant part, that the State's Chief Fiscal Officer "will determine, from time to time, the amount of funds required from the Educational Adequacy Fund which, when added to other resources available to the Department of Education Public School Fund Account and the Department of Education Fund Account, is needed to fulfill the financial obligation of the state to provide an adequate educational system as enacted by the Second Extraordinary Session of the 84th General Assembly and shall certify the amounts to the Treasurer of State." Act 108 of 2003 (2d. Ex. Sess.), § 1(c)(1).

Act 108 further provides that, in the event the Chief Fiscal Officer determines that the transfers from the Education Adequacy Fund are not sufficient to meet the state's financial obligation to provide an adequate educational system," the additional amount required shall be transferred from the other funds and fund accounts within Arkansas Code 19-5-402(a) and 19-5-404(a) based upon the proportion that each of the remaining fund and fund accounts bears to the total of the remaining funds and fund accounts in Arkansas Code 19-5-402(a) and 19-5-404(a)." *See* Act 108 of 2003 (2d. Ex. Sess.), § 1(d).

> Ark. Const., art. 14, § 1. . . . [In approving the Constitution of 1874,] [t]he people of this state unquestionably wanted all departments of state government to be responsible for providing a general, suitable, and efficient system of public education to the children of this state.

*Lake View*, 351 Ark. at 52-53 [emphasis added in original]. Our role is to evaluate the evidence in light of the provisions of Art. 14, once the General Assembly and the Governor submit their proposals intended to achieve a constitutional system of school funding. We can then properly interpret the constitutional issue in order to determine whether the State has achieved compliance.

CAROL DALBY, Special Justice, concurring. I agree with the court's decision to recall the mandate and stay the issuance of the mandate until December 1, 2006, so that the constitutional deficiencies are corrected. I write separately on the issue of jurisdiction.

In the court's opinion delivered June 9, 2005, *Lake View Sch. Dist. No. 25 v. Huckabee*, 362 Ark. 520, 210 S.W.3d 28 (2005), I, along with two other justices, dissented with the majority in part based upon this court's lack of jurisdiction to recall the mandate issued in *Lake View Sch. Dist. No. 25 v. Huckabee*, 358 Ark. 137, 189 S.W.3d 1 (2004). I lost on that point. The majority ruled that jurisdiction exists. This is the rule of law of this case and I recognize that holding and accept that rule. This court has jurisdiction as previously held; therefore, I see neither reason nor justification to continue dissenting on this point. I am bound by the holdings of the court in its previous decisions.

The majority opinion sets forth in clear and concise terms that our state is still operating under an unconstitutional public school funding system and that this court is part of the state. As part of the state, it is this court's solemn duty and trust to the people of Arkansas to stay engaged in the endeavor to bring about a constitutional system. Our constitution demands it.

There is upon the horizon the goal of a general, suitable, and efficient system of free public schools for all children of our state. Ark. Const. art. 14, § 1. That goal will one day be attained and upon attainment a mighty shout of rejoicing will be heard by and for the real victors of this struggle — our children. The echoes of all the combined efforts to reach this goal will be heard and felt

throughout the valleys, the forests, the mountains, and the most hidden and tucked away places of our state for generations to come.

J IM HANNAH, Chief Justice, dissenting. I respectfully dissent. Since *Lake View School District No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002) (*Lake View III*), this court has issued orders and directives to our coordinate branches of government to undertake specific actions and enact specific legislation.[1] This court has further issued decisions instructing special masters to report to this court after monitoring, examining, and evaluating activities of our coordinate branches of government. I have never agreed that this court has the authority to control our coordinate branches of government; however, under the principle of stare decisis, I would now assent and join the majority if this court had jurisdiction to issue such judgments. However, a judgment entered without jurisdiction of the person or the subject matter or in excess of the court's power is void. *Raymond v. Raymond*, 343 Ark. 480, 36 S.W.3d 733 (2001). This court does not possess the authority to control and supervise the General Assembly in its policy decisions as the majority has attempted to do since November 21, 2002. I am unable to join the majority under the principle of stare decisis because there is no question that this court lacks jurisdiction to control, monitor, issue orders to, or otherwise direct our coordinate branches of government. My deep respect for our constitution, justice, and our representative form of government compels me to continue to dissent. I object to this usurpation of legislative power and the destruction of the separation-of-powers doctrine.

*Responsibility for Establishment and Operation of the Public Schools Lies Exclusively with the General Assembly*

Great confusion was engendered in this case when the majority chose to ignore longstanding precedent. This court has consistently held in the past that although the constitution uses the

---

[1] The majority may believe that in issuing orders and directives, it is only communicating what must be done to make the schools constitutional. However, that simply is not so. Phrases used by the majority in its opinions, such as "noncompliance," "failure to comply," "comply with this court's directives," "comply with this court's order" and "assure compliance," simply will not admit of such an interpretation. Further, phrases such as "steps taken by the State to put in place a system," cannot be interpreted as anything other than this court directing the General Assembly to enact legislation.

word "State" in referring to the responsibility to establish and operate a constitutional system of public schools, it is the General Assembly alone that bears the responsibility. However, despite all our prior holdings, the majority again disregards precedent and opines:

> We emphasize once more that it is the *State* that must provide a general, suitable, and efficient system of public education to the children of this state under the Arkansas Constitution. The roles of the executive and legislative branches are integral to assuring that this transpires. But it is also the duty of this court to assure constitutional compliance when compliance is challenged and to assure that the will of the people of our state as expressed in our constitution is fulfilled. We will perform that duty.

(Emphasis in original.)

Our constitution was adopted in 1874, and by 1934, this court held that it was beyond "debate" that the General Assembly is responsible in Arkansas for establishment, "management and operation" of the public schools and that it is for the General Assembly to "declare policy" with respect to the schools. *Wheelis v. Franks*, 189 Ark. 373, 377, 72 S.W.2d 231, 232 (1934). This is not the only case that so holds.[2]

The majority concludes that responsibility for the public schools is born by state government as a whole in a blended fashion. This conclusion is impermissible because our constitution provides for "distinct separation" and does not permit "blending" of authority as the majority holds. *Spradlin v. Arkansas Ethics Comm'n*, 314 Ark. 108, 115-116, 858 S.W.2d 684, 686 (1993) (quoting *Oates v. Rogers*, 201 Ark. 335, 346, 144 S.W.2d 457, 462 (1940)). The error regarding which branch of government is

---

[2] *See Lloyd v. Knight*, 288 Ark. 474, 706 S.W.2d 393 (1986); *Heber Springs Sch. Dist. v. West Side Sch. Dist.*, 269 Ark. 148, 599 S.W.2d 371 (1980); *Wallace Sch. Dist. v. County Bd. of Educ.*, 214 Ark. 436, 439, 216 S.W.2d 790 (1949). The Arkansas Constitution vests in the General Assembly the duty and authority to establish, maintain, and support a public school system. *Barker v. Frank*, 327 Ark. 589, 939 S.W.2d 837 (1997); *East Poinsett County Sch. Dist. No. 14 v. Massey*, 315 Ark. 163, 866 S.W.2d 369 (1993); *Saline County Educ. Bd. v. Hot Springs Educ. Bd.*, 270 Ark. 136, 603 S.W.2d 413 (1980). *See also Lemaire v. Henderson*, 174 Ark. 936, 298 S.W. 327 (1927). That the legislature has plenary power over the public schools means that it has full power. *Beard v. Albritton*, 182 Ark. 538, 31 S.W.2d 959 (1930).

responsible for establishing and operating a constitutional system of public schools leads to the next fundamental error by the majority.

*The Court May Not Direct or Issue Orders to the General Assembly*

Under the errant idea that all three branches of government bear responsibility for establishing and operating a system of public schools, the majority has decided that it is this court's "duty to assure constitutional compliance" with the constitutional mandate for general, suitable, and efficient public schools. To "assure" means to guarantee. *The New Shorter Oxford English Dictionary* 134 (4th ed. 1993). The majority has erred in undertaking to assure compliance by issuing orders and directives to the General Assembly. It is not within this court's jurisdiction to issue orders or direct policy in coordinate branches of government. The court's jurisdiction and role in this case is to review the lower court's orders to determine whether our children are receiving a general, suitable, and efficient public education in compliance with the Arkansas Constitution. Certainly in any decision on the constitutionality of the schools, we can and should explain why a school system established by the General Assembly fails to comply with constitutional requirements, but it is up to the General Assembly to then make the policy decisions and enact such legislation as it finds is needed to supply the required constitutional school system. The special masters were asked to investigate policy decisions of the General Assembly and report on whether this court's orders and directives to the General Assembly had been complied with by the General Assembly. That is a very different matter than this court addressing how a school system fails to meet the constitutional requirement of a general, suitable, and efficient system of free public schools.

However, to the contrary in *Lake View School District No. 25 v. Huckabee*, 356 Ark. 1, 2,144 S.W.3d 741, 742 (2004), the special masters were instructed to "examine and evaluate the legislative and executive action taken since November 21, 2002, to comply with this court's order and constitutional mandate. . . ." In this same opinion, the special masters were instructed to report to the court on the progress of the General Assembly in enacting legislation on ten specific subjects: (1) Steps taken to implement the adequacy requirements this court ordered the coordinate branches of government to develop "forthwith." (2) Steps taken to put in place a system to monitor school curricula; (3) Steps taken to assure

an equal curricula is offered to all; (4) Steps taken to evaluate facilities and equipment; (5) Steps taken to assure that equal facilities and equipment are offered; (6) Steps taken to assure teachers salaries are sufficient to avoid migration; (7) Accountability and accounting measures put in place to determine per-pupil expenditures; (8) Accountability and testing measures to evaluate performance; (9) Measures taken to enact a satisfactory funding system; and (10) Measures taken to assure that funding of education is the priority in budgeting. *Lake View*, 356 Ark. at 2-3, 144 S.W.3d at 742.[3] The majority in the present opinion accuses the General Assembly of retreating "from its actions to comply with this court's directives." This court is without jurisdiction to direct or to "examine and evaluate," or in other words, grade or otherwise critique the actions of the coordinate branches of government. The majority is attempting to supervise, monitor, and direct. This we may not do. Implicit within directing, examining, and evaluating is the right to correct, presumably by the contempt power. The majority characterizes its obligation under art. 14, § 1 as the this court's duty to "assure compliance" with the mandate to provide a general, suitable, and efficient system of free public schools. It is the legislative body that sets policy, not this court. It is the legislative body that raises and appropriates funding, not this court. The separation of powers is simply ignored by the majority.

In Arkansas, the judiciary is a coordinate branch of government and each branch is of equal dignity. *In re Supreme Court License Fees*, 251 Ark. 800, 483 S.W.2d 174 (1972). "It is not the function or within the power of this court to invade the constitutional authority of the legislature, a coordinate branch of our government." *City of Piggott v. Eblen*, 236 Ark. 390, 396, 366 S.W.2d 192, 196 (1963).

> The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sover-

---

[3] Although this concerns the second appointment, the scope of their duties were the same as set out in 2004. *Lake View Sch. Dist. No. 25 v. Huckabee*, 362 Ark. 520, 210 S.W.3d 28 (2005).

eign capacity can correct the evil; but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the law-making power.

*Ex Parte Byles*, 93 Ark. 612, 617, 126 S.W. 94, 96 (1910) (quoting Thomas M. Cooley, *Constitutional Limitations*, at 236 (7th ed. 1903)). I also note that the majority may take no support for its unconstitutional actions from *Dupree v. Alma School District No. 30*, 279 Ark. 340, 651 S.W.2d 90 (1983). In *Dupree*, this court examined the then-existing school system, declared it unconstitutional, and stated why. This court stated nothing in *Dupree* about "assuring compliance." No orders were issued to the General Assembly.

The separation-of-powers doctrine exists for very good reasons, and it is simple. As Justice John Marshall stated, "The difference between the departments undoubtedly is, that the legislative makes, the executive executes, and the judiciary construes the law. . . ." *Wayman v. Southard*, 23 U.S. 1, 46 (1825). At its inception, this country rejected the method the majority now embraces: the blending of the legislative and judicial powers as then existed in England between the English judiciary and the House of Lords.

To construe is to interpret and declare constitutionality. *See, e.g., Brewer v. Fergus*, 348 Ark. 577, 79 S.W.3d 831 (2002). While declaring constitutionality is the proper function of the judiciary, assuring compliance by directing and issuing orders to the legislative branch is unconstitutional usurpation. As Alexander Hamilton stated in *The Federalist*, "liberty can have nothing to fear from the judiciary alone, but would have everything to fear from its union with either of the other two departments. . . ." *The Federalist No. 78*, at 402-03 (Alexander Hamilton) (George W. Carey and James McClellan eds., 2001). By assuming the power to dictate policy and control the legislative branch, this court is uniting legislative and judicial powers. The concentration of the powers of the three separate branches of government into the same hands, be they few or many, leads to the destruction of freedom. *See State v. Hutts*, 2 Ark. 282, 286 (1839). This court has no jurisdiction to direct or order the General Assembly, or to monitor its activities by examining and evaluating its actions as the majority attempts to do.

*Special Masters' Report*

Although I disagree with the majority's decision in this case, I do wish to take this opportunity to note that the special masters performed admirably under the circumstances. Their report is complete and detailed within its limitations and may well be of significant use to the General Assembly.

### Acts 57 and 108

The majority holds that "the General Assembly failed to comply with Act 57 and Act 108 in the 2005 regular session, and by doing so, retreated from its prior actions to comply with this court's directives in *Lake View Sch. Dist. No. 25 v. Huckabee*, 351 Ark. 31, 91 S.W.3d 472 (2002)." It is this court's function to declare whether the General Assembly has complied with the constitution in providing a general, suitable, and efficient system of free public schools. Whether the General Assembly does so by Act 57, Act 108, or by thirty acts, or no acts at all has no bearing on this court's duty to declare constitutionality. Again, the majority attempts to set policy and direct the General Assembly. This we may not do.

### Premature Action and Contempt

The intervenors have requested a finding of contempt each time they have reopened this case since *Lake View III*. However, they have never pressed the issue and in oral argument have consistently stated that they were not asking that we hold the legislative and executive branches in contempt. I would suggest that the intervenors recognize they have not met their burden of proof even if contempt were applicable.

It is clear that information on the consequences of actions taken by the General Assembly in 2003 and 2005 is incomplete, and accurate information will not be available for some time. The intervenors encourage us in a footnote to their Motion for Action not to consider the reports of improvements in test scores and ranking in teacher pay because the information was not available at the time of the hearings before the special masters. Similarly, in oral argument it was noted that very significant sums of money are currently held by the school districts that have not yet been used. It also appears that increased funding to school districts has resulted in significant increases in sums of money simply being held by the districts rather than being spent on the children. For example, one

State's expert testified before the special masters that the increase in funding, 18% of the total budget, resulted in funds that cannot be spent in the first year without waste. Our constitution requires an efficient system of public schools. If, as the intervenors claim, all this information was not existent at the time of the hearings before the special masters, then obviously it was not available prior to the 2005 legislative session, nor available during the 2005 legislative session. If that information was not available, then the intervenors did not meet their burden of proof. What this shows is that confusion results when a branch of government steps outside its authority and undertakes to perform the duties of another branch. All this also exemplifies how this court has also erred in attempting to decide the constitutionality of legislation that has not been fully implemented and subjected to trial in the circuit court. In the end, this case has degenerated to an argument about money instead of whether the schools meet constitutional requirements.

Further, at the very least, even under the theory espoused by the majority, the hearings before the special masters were premature. Waste is what has come of this action. This outcome was predictable because this court is not a legislative body possessing the tremendous amounts of information needed to make legislative decisions and is not capable of carrying out the needed analysis of such masses of information. Yet this court has attempted to make itself a legislative body, issuing directives and orders to the General Assembly regarding acts it was to undertake and legislation it was to pass.

The directives and orders of this court in this case all concern policy. Policy is decided by the legislative body. "Courts of justice are properly excluded from all considerations of policy, and therefore are very unfit instruments to control the action of that branch of government." *The Cherokee Nation v. Georgia*, 30 U.S. 1, 30 (1831). This case has received special treatment, and it should be kept in mind that others will expect the same treatment in separation-of-powers cases that have nothing to do with the schools. It is time to reaffirm that this court may not order, monitor, direct, examine, evaluate, oversee, critique, or compel action by our coordinate branches of government. We must restore the dignity and comity we should have between branches of government and make sure that the checks and balances that have provided stability in our representative form of government are not lost.

No one on this court disagrees that the children of Arkansas should be provided the opportunity to obtain the best possible education. That is unquestionably the desire of every member of this court. No less than any member of this court, I desire that the schools of this state be fixed immediately. We should not destroy the separation-of-powers doctrine for the sake of expediency and obtaining a desired result. The majority is in error. There is a better way. The constitutional way of allowing the legislative branch to carry out its duties unimpaired by this court may be a slower way, but it is the right way. *City of Hot Springs v. Creviston*, 288 Ark. 286, 705 S.W.2d 415 (1986).

GUNTER, J., joins.