The Honorable Bryan B. King State Representative
871 County Road 814 Green Forest, Arkansas 72638-2657
Dear Representative King:
I am writing in response to your request for my opinion on a question I will paraphrase as follows:
 Is there a conflict between the provisions of A.C.A. § 6-20-2305(a)(4) and A.C.A. §§ 26-80-101(b)(1) and (c)? More generally, is the state entitled to withhold and redistribute revenues from the uniform rate of tax generated under Amendment 74 if these revenues in a given district exceed the foundation-funding amount that the district is entitled to receive in order to meet the state's constitutional obligation to provide all students an adequate education?
You have indicated that your request is basically one for clarification of my conclusion in Op. Att'y Gen. No. 2010-094 that if, in any given school district, revenues realized from the 25-mill uniform rate of property tax (the "URT")[1] exceed foundation funding, [2] the state may redistribute the excess revenues to other *Page 2 
school districts whose URT revenues fall short of the constitutionally mandated foundation funding. Your concern is apparently whether this conclusion, which I based in part on my reading of A.C.A. § 6-20-2305(a)(4) (Supp. 2009), is consistent with the provisions of A.C.A. §§ 26-80-101(b)(1) and (c) (Repl. 2008), which you imply might mandate that a school district be reimbursed by the state for the full amount of its URT revenues even if these exceed the required amount of foundation funding.
RESPONSE
I continue to subscribe to the conclusions I reached in Opinion No. 2010-094. Subsection 6-20-2305(a)(4) of the Code provides as follows:
 (A) By the end of each school fiscal year, for a school district whose net revenues[3] are less than the sum of ninety-eight percent (98%) of the uniform rate of tax multiplied by the property assessment of the school district, the Department of Education shall distribute to the school district the difference between:
 (i) The net revenues distributed to the school district as reported under § 26-26-2004[4] for the calendar year immediately preceding the current school year; and
 (ii) The sum of ninety-eight percent (98%) of the uniform rate of tax multiplied by the property assessment of the school district.
 (B) For a school district whose net revenues are more than the sum of ninety-eight percent (98%) of the uniform rate of tax multiplied by the property assessment of the school district, the Department of *Page 3 
Education, under the authority of § 6-20-2306, shall recoup from the school district an amount equal to the difference between:
 (i) The net revenues of the school district; and
 (ii) The sum of ninety-eight percent (98%) of the uniform rate of tax multiplied by the property assessment of the school district.
As I indicated in my previous opinion, these statutory formulas are subject to the condition that each district is entitled to receive from the state at least the foundation amount calculated pursuant to A.C.A. § 6-20-2305(a)(2)(B). I need not repeat my analysis of this issue here. As I further noted in my earlier opinion, the only qualification to this conclusion is that the state is precluded from retaining any URT revenues by operation of Amendment 74, which mandates that all proceeds of the URT be distributed to the school districts. As this office has repeatedly noted, [5] the URT is a state tax levied by the voters themselves in adopting Amendment 74. The state has both the discretion and the obligation to redistribute this tax to school districts in any manner that will ensure that it fulfills its obligation to provide all students in the state an adequate education as defined under the Arkansas Supreme Court precedent discussed in the previous opinions referenced above.
Your apparent concern is that these conclusions might conflict with the terms of the legislation implementing Amendment 74 set forth in A.C.A. §§ 26-80-101(b)(1) and (c), which provide:
 (b)(1)(A) The uniform rate of tax shall be assessed and collected in the same manner as other school property taxes, but the net revenues from the uniform rate of tax shall be remitted to the Treasurer of State and distributed by the state to the county treasurer of each county for distribution to the school districts in that county as provided by subsection (c) of this section.
 (B) No portion of the revenues from the uniform rate of tax shall be retained by the state but shall be distributed back to the school *Page 4 
district from which the revenues were received or to other school districts pursuant to subsection (c) of this section.
 (C) No additional fees or charges shall be assessed at the local level for transmission and redistribution of these funds.
 (D) The revenues so distributed shall be used by the school districts solely for maintenance and operation of schools.
 * * * (c) For each school year, each county treasurer shall remit the net revenues from the uniform rate of tax to each local school district from which the revenues were derived.
This statute on its face is internally inconsistent. Subsection (b)(1)(B) clearly contemplates that URT revenues raised in a particular district might be distributed "to other school districts," whereas subsection (c) indicates that "net revenues" should be remitted to the school district from which the revenues derived.
Resolving this inconsistency turns on applying clear constitutional imperatives. As the Arkansas Supreme Court made clear in Dupree v.Alma School District No. 30, 279 Ark. 340, 342, 651 S.W.2d 90 (1983), basing educational funding upon disparities in tax revenues between property-rich and property-poor school districts is inconsistent with the constitutional requirements of equal protection mandated by Ark. Const. art. 2, §§ 2, 3 and 18, and of adequacy and equity in education mandated by Ark. Const. art. 14, § 3. As the court noted with regard to the circumstances in effect at that time:
 This great disparity among the districts' property wealth and the current state funding system as it is now applied does not equalize the educational revenues available to the school districts, but only widens the gap.
279 Ark. at 344. The court went on to note:
 The trial court found the educational opportunity of the children in this state should not be controlled by the fortuitous circumstance of *Page 5 
residence, and we concur in that view. Such a system only promotes greater opportunities for the advantaged while diminishing the opportunities for the disadvantaged.
Id. at 345. Sealing the point, the court remarked:
 For some districts to supply the barest necessities and others to have programs generously endowed does not meet the requirements of the constitution. Bare and minimal sufficiency does not translate into equal educational opportunity. "Equal protection is not addressed to minimal sufficiency but rather to the unjustifiable inequalities of state action." San Antonio School District v. Rodriguez, 411 U.S. 1, 70 (1972). Marshall, J., dissenting.
Id. at 347. With regard to then applicable law, the court defined the following as "the main issue":
 When all counties are assessed at the proper level, the gap will still exist between the poor and wealthy districts and the mandate of the constitution will remain unfulfilled.
Id. The court defined "two major problems" related to school financing:
 The first is the obvious disparity in property wealth among districts. That wealth is what primarily dictates the amount of revenue each district receives and the quality of education in that district. The second problem is the manner in which the state determines how the state funds are distributed. . . . Ultimately, the responsibility for maintaining a general, suitable and efficient school system falls upon the state. "Whether the state acts directly or imposes the role upon the local government, the end product must be what the constitution commands. [When a district falls short of the constitutional requirements], whatever the reasons for the violation, the obligation is the state's to rectify it. If local government fails, the state government must compel it to act, and if the local government *Page 6 
cannot carry the burden, the state must itself meet its continuing obligation."[6]
Id. at 349 (brackets in original).
The operative principle with respect to your question is perhaps most aptly summarized as follows in Fort Smith School District v.Beebe, 2009 Ark. 333, 11-12, 322 S.W.3d 1, *7-8:
 [A]ccording to its plain language, Amendment 74 "allows for variances in school district revenues above the base millage rate of 25 mills, which may lead to enhanced curricula, facilities, and equipment which are superior to what is deemed adequate by the State." Lake View Sch. Dist. No. 25 v. Huckabee, et al., 358 Ark. 137, 189 S.W.3d 1 (2004) ("Lake View 2004"); Lake View Sch. Dist. No. 25 v. Huckabee, et al., 351 Ark. 31, 43, 91 S.W.3d 472, 478 (2002)("Lake View 2002").
 Appellants claim that, by reducing the funds from the State when there is growth in the revenue generated from the URT, the State is constructively retaining the URT funds. Once again, we must disagree. First, there is no dispute that the State distributes all URT funds collected back to the school districts. Lake View 2005, 364 Ark. 398, 402, 220 S.W.3d 645, 648. As noted by Appellees, the result urged by Appellants "would directly tie the adequacy amount to property wealth in the State." This court has decreed that the State of Arkansas must provide the children of this State with an adequate and substantially equal education. Lake View Sch. Dist. No. 25 v. Huckabee, 362 Ark. 520, 210 S.W.3d 28 (2005). We have expressly stated that, while Amendment 74 does authorize funding variances, it "does not authorize a system of school funding that fails to close the gap between wealthy school districts with premier educational programs and poor school districts on the lower end of the economic spectrum, which are mired in poverty and unable to provide a system of education much above the most elementary kind." Lake View 2002, 351 Ark. 31, 77, 91 S.W.3d 472, 499. The *Page 7 
school funding system, fashioned by the General Assembly in response to this court's decisions in the Lake View litigation, set a base-level of funding per student required to provide a constitutionally adequate and substantially equal education. Ark. Code Ann. § 6-20-2305. To reach that amount of per student funding, the URT revenues are calculated, and the State then makes up the difference with foundation funding aid. In sum, the twenty-five mills URT and the net revenues it generates are used to determine the amount of state foundation aid, as opposed to Appellants' premise that Amendment 74 revenues merely supplement state funding. Lake View 2005, 364 Ark. 398, 402, 220 S.W.2d 645, 648.
With respect to the relationship between URT revenues and the minimal foundation funding per student required to meet constitutional requirements, the court offered the following:
 The amount of state foundation funding aid each school district receives in a given year is computed as "the difference between the foundation funding amount pursuant to subdivision (a)(2) of this section and the sum of ninety-eight percent (98%) of the uniform rate of tax multiplied by the property assessment of the school district plus the miscellaneous funds of the school district." Id.; Ark. Code Ann. § 6-20-2305(a)(1)(A) (Repl. 2007). . . . Thus, given the provisions of Amendment 74 and the statutes enacted by the General Assembly, each school district in Arkansas, for the 2007-2008 school year, would receive state foundation funding aid according to the formula in Section 6-20-2305(a)(1)(A). For example, in 2007-2008, the State made up the difference between $5,719 per student and the revenue generated by the 25 mills URT in any given school district.
Id. at 9-10.
As this office has repeatedly noted, the URT is a statewide, constitutionally mandated absolute minimum rate of taxation for M O. See note 5, supra. Amendment 74 expressly acknowledges the distinction between the state millage (namely, the URT) devoted to M O and any additional local millage that might *Page 8 
supplement revenues to be devoted to the same purpose. The latter millage obviously belongs to the district that levied it. The former, however, is a state tax that the state is obliged to return to the generating district only up to the point that the state has met its constitutionally mandated foundation funding amount. As indicated above, it would offend constitutional requirements to suggest that in the rare instance when a property-rich district generates higher URT revenues than the foundation-funding requirement, the district might recover the excess at the expense of property-poor districts that might approach the adequacy requirement by using these revenues.
I feel obliged to respond to two other matters you set forth in your statement of background facts. First, you suggest that the recoupment formula set forth in A.C.A. § 6-20-2305(a)(4)(B) might not apply to the property-rich districts because the Department's recoupment authority under this statute is limited to the conditions set forth in A.C.A. § 6-20-2306. As you point out, A.C.A. § 6-20-2306(a) provides that the Department will recoup its revenues only upon a determination "that an overpayment has been made to a school district under any appropriation authorized by this subchapter." This limitation, however, does not mean that the state cannot recoup excess URT revenues that have been returned to a school district in the ordinary course of the state treasurer's remitting state revenues to the district that generated them. To the extent that this repayment exceeds the URT, it is by definition an "overpayment."
Secondly, you point out the "[t]he Arkansas Constitution prior to Amendment 74 contained the provision that `. . . no such tax shall be appropriated for any other purpose nor to any other district that that for which it is levied." You further point out that Amendment 74 provides: "Any provision of the Constitution of the State of Arkansas in conflict with this Amendment is repealed in so far as it is in conflict with this Amendment." I have two responses. First, the provision quoted at the beginning of this paragraph is no longer a part of the constitution. Secondly, even if it were, the provisions of Amendment 74 would trump the contradictory earlier formulation. Subsection (b)(3) of Amendment 74 dictates that URT revenues shall be remitted by the state treasurer to "the school districts" — a plural formulation that authorizes the redistribution of these revenues in appropriate cases. Significantly, subsection (c)(3) of Article 14, § 3, which incorporates Amendment 74, provides as follows: "No tax levied pursuant to subsection (c)(1) of this section shall be appropriated to any other district than that for which it is levied." Subsection (c)(1) deals only with local mills imposed over and above the *Page 9 
state URT. Implicit in this provision is a recognition that the distinct state URT revenues may be appropriated in whatever manner accords with the requirements of adequacy and equity in educational funding.
Assistant Attorney General Jack Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
DUSTIN McDANIEL Attorney General
[1] This 25-mill tax for maintenance and operation of the schools is mandated by Ark. Const. amend. 74, which is now incorporated in Ark. Const. art. 14, § 3.
[2] The Arkansas Code defines the term "foundation funding" as follows:
 "Foundation funding" means an amount of money specified by the General Assembly for each school year to be expended by school districts for the provision of an adequate education for each student[.]
A.C.A. § 6-2-2303(6) (Supp. 2009).
[3] The term "net revenues" means "actual revenues generated from ad valorem taxes and distributed to a school district multiplied by the ratio derived from dividing the uniform rate of tax by the total millage rate of the school district." Id. at § -2303(13). The ratio in the multiplicand of this formula is clearly designed to reduce total property-tax revenues to an amount that reflects revenues actually realized from the URT.
[4] Despite this reference, the Code contains no section 26-26-2004.
[5] See, e.g., Ops. Att'y Gen. Nos. 2009-056, 2004-359, 2004-134, 2003-065 and 2003-031.
[6] Quoting Robinson v. Cahill,303 A.2d 273, 295 (N.J. 1973). *Page 1